# Rubber Company *v.* Goodyear.

1. Where a patentee dies, the surrogate of the place where the decedent was domiciled properly has jurisdiction to take probate of his will and issue letters testamentary.
2. Where several executors are appointed by the will of a patentee decedent—provision being made, however, for one alone acting—and but one proves the will and receives the letters of administration, he alone can maintain an action for infringement of the letters patent at common law.
8. Under the laws of the United States, where a patent is granted by the government to C. G. as executor, he can maintain a suit on the patent in all respects as if he had been designated in the patent as trustee instead of executor.
4. An objection to the authority of an executor to maintain a suit on letters patent should be taken by a plea in abatement.
5. The novelty of the Charles Goodyear patent for vulcanized rubber sustained.
6. A patentee or his representative in a reissue may enlarge or restrict the claim, so as to give it validity and secure the invention.
7. A process and the product of a process may be both new and patentable, and are wholly disconnected and independent of each other.
·8. Extended letters patent cannot be abrogated in any collateral proceeding for fraud.
9. A license to use an invention by a person only at *"his own establishment,"* does not authorize a use at an establishment owned by himself and others.
10. In taking an account, the master is not limited to the date of entering the decree; he can extend it down to the time of the hearing before him.
11. An objection that the word "patented" was not affixed by the complainant, under section 13 of act of March 2d, 1861 must be taken in the answer, if it is intended to be raised at the hearing or before the master.
12. A decree "for all the profits made in violation of the rights of the complainants under the patents aforesaid, by respondents, by the manufacture, use, or sale of any of the articles named in the bill of complaint," is correct in form.
13. Profits are rightly estimated by the master by finding the difference between cost and sales.
14. In estimating this cost, the elements of cost of materials, interest, expense of manufacture and sale, and bad debts, considered by a manufacturer in finding his profits, are to be taken into account, and no others.

15. Interest on capital stock and "manufacturer's profits" were properly disallowed by the master.
16. Profits due to elements not patented, which entered into the composition of the patented article, may sometimes be allowed. They were, however, properly disallowed in this particular case.
17. Extraordinary salaries were properly disallowed by the master, on the ground that they were dividends of profit under another name.

APPEAL from the Circuit Court for Rhode Island.

This case involved various questions arising upon the well-known patent of Charles Goodyear, for what is commonly styled vulcanized India-rubber, and on different surrenders to himself, as also, after his death, to his testamentary executors.

The novelty of Goodyear's invention was also brought into question.

The reader is referred for the case to the statement of it as made in the opinion.

*Messrs. Payne, Cushing, Parsons, and Black, for the appellants; Messrs. Stoughton, Ackerman, and Evarts, contra.*

Mr. Justice SWAYNE stated the case and delivered the opinion of the court.

This is an appeal in equity from the decree of the Circuit Court of the United States of the District of Rhode Island. The appellees were the complainants in the court below. The defendants were the appellants, and William W. Brown, Edwin M. Chaffee, and Augustus O'Bourne. The bill alleges that a patent for "a new and useful improvement in India-rubber fabrics" was originally granted to Charles Goodyear, deceased, on the 15th of June, 1844; that this patent was surrendered, and that on the 15th of June, 1849, a patent was reissued to the original patentee, "for a new and useful improvement in processes for the manufacture of India-rubber;" that it was extended by the Commissioner of Patents on the 14th of June, 1858; that this patent was surrendered by Charles Goodyear, Jr., executor of Charles Goodyear, deceased, and reissued to him as executor on the

20th of November, 1860, in two patents, one entitled, "for improvement in the manufacture of caoutchouc," and the other, "for improvement in the art of preparing caoutchouc;" that the complainants, other than Charles Goodyear, Jr., are the assignees of licensees of Charles Goodyear deceased; that the complainants have the exclusive right to manufacture and sell army and navy equipments made of vulcanized India-rubber, including vulcanized India-rubber blankets, coats, cloaks, cloth, clothing, ponchos for army, navy, and other purposes, and also of vulcanized India-rubber bulbs, to be used in the manufacture of syringes; and that the defendants have infringed the patents by the manufacture and sale of these articles.

The prayer of the bill is for an injunction and an account.

The answer denies that Goodyear was the original and first inventor of the improvement described in the original patent. It denies also the infringement alleged in the bill. It sets up as special defences that only one of the persons named in the will of Charles Goodyear, deceased, as executors, is made a party complainant; that the original patent is invalid; that all the reissues are void, even if the original patent were valid, because the claims are broader than the claim in the original patent; and that they are not, nor is either of them, in fact, for the same invention as that for which the original patent was granted; and that the extension of the patent in June, 1858, by the Commissioner of Patents, was procured "by fraud and collusion, by fraudulent suppressions and concealments from, and by false and fraudulent representations to," that officer. The answer also claims that the defendants are not infringers, because they have manufactured their goods under a license from the original patentee to E. M. Chaffee, dated June 25th, 1848, which they insist is valid and outstanding, and a complete defence to this suit.

A large mass of testimony was taken by the parties. The record covers nearly one thousand two hundred printed pages. The court decreed in favor of the complainants. The defendants have brought the case here for review.

It has been argued in this court on both sides with great learning and ability. The propositions to which our attention has been called as grounds for the reversal of the decree are not numerous, and the scope of our remarks will not be extended beyond them.

Charles Goodyear, deceased, by his will appointed his son, Charles Goodyear, Jr., his wife, Fanny Goodyear, and James A. Dorr, his executors. The will provided that a majority of the executors should decide all questions that might arise; that the acts of a majority should be as binding as the acts of all; that if at any time there should be but two, they might appoint a third; and that if there should be but one, he might appoint another. The manner of appointment in both cases was specified.

It is insisted that Charles Goodyear, Jr., alone, as executor, cannot maintain this suit, and that his co-executors named in the will are necessary parties. The evidence in the record shows that the testator was domiciled and had property in the city of New York. This gave the surrogate there jurisdiction to take the probate of the will, and to issue letters testamentary. Charles Goodyear, Jr., alone proved the will, and received such letters. The other persons named as co-executors have taken no step in that direction. They have never at any time assumed to do any act or claimed any right by virtue of their nomination in the will.

At the place where the letters testamentary were issued the common law relied upon by the appellants was in conflict with the statutory provisions of the State, and was therefore abrogated. It could no more be recognized in the Federal than in the State tribunals. Nor is the rule in courts of equity different from the rule in the courts of law. Neither can recognize the authority of an executor any more than that of administrator, and neither will aid him to obtain possession and control of the estate, until he has fulfilled the conditions and given the guarantees of fidelity and solvency prescribed by the local law. A different rule could hardly fail to be followed by the most mischievous consequences.

If, however, the question were to be settled by the rules

of the common law, we should be of opinion, upon the facts of the case as disclosed in the record, that the suit was well brought by Charles Goodyear, Jr., alone. But there are other considerations bearing upon the subject which are still more satisfactory to our minds.

The patent law of the United States authorizes an executor to surrender a patent and take a reissue.* In this case the patent was surrendered by Charles Goodyear, Jr., as executor, and the reissues were to him in the same character. This was a specific grant by the government, and vested in him exclusively the legal title. The suffix of *executor* signified the trustee character in which he assumed to act, and in which he was recognized and dealt with by the commissioner. The designation, and the trust which it implied, did not prevent the passage of the legal title or qualify the estate which accompanied it. It follows from this view of the subject that the grantee can sustain a suit on the patent in all respects, as if he had been designated in it as *trustee* instead of executor.

But, conceding for the purposes of the argument, that he occupies the same relation to the patents reissued to him as to the one reissued to the testator, and which he surrendered, then he was a foreign executor in the forum where the suit was instituted.

The bill alleges that he was the executor of Charles Goodyear, deceased. His rights as such in that forum depended upon the local law of Rhode Island. If his authority to sue there in his representative character was intended to be questioned, it should have been done by plea or by the answer. Not having been done in that way, the defendants are concluded, and the question is no longer open in the case. The answer is silent upon this point. Its averments touching the jurisdiction of the surrogate of the city of New York are effectually disposed of by the complainants' proofs.

In any view which can be taken of the subject the objection is untenable.

---

* Act of July 4th, 1836, § 18.

The proposition that the patent is fatally defective, because it is impossible to make merchantable goods according to the directions contained in the specifications, cannot be entertained. The answer contains no averment upon the subject. No such issue was tendered to the complainants, and they have had no notice that such a defence was intended to be relied upon. In equity, the proofs and allegations must correspond. The examination of the case by the court is confined to the issues made by the pleadings. Proofs without the requisite allegations are as unavailing as such allegations would be without the proofs requisite to support them.*

It is alleged in the answer that the testator was not the original and first inventor of the process described in his patents.

The original patent was issued in 1844. The invention has since been covered by a succession of patents, the last of which, the reissues in question, are still unexpired, and are the foundation of this litigation. The discovery was one of very great value. It is a mine of wealth to the possessors. Since the first patent was issued there have been numerous cases of litigation involving its validity. They were earnestly contested. In every instance the patent was sustained. This litigation was remarked upon by the counsel for the appellants, and it was added that this question is now, for the first time, presented to this court for consideration. It is a just commentary to say that such a litigation is always to be expected in cases like this. There are always those who are ready to gather where they have not sown. The number and ardor of the conflicts is usually in proportion to the value of the prize at stake. The validity of the claim of the testator was never shaken by any adjudication. It has been uniformly affirmed and sustained. If the subject was never brought here before, it was doubtless because those who were defeated elsewhere saw no ground for the hope of a more favorable result in this court. These considerations

* Foster *v.* Goddard, 1 Black, 518; Tripp *v.* Vincent, 3 Barbour's Chancery, 613; Boone *v.* Chiles, 10 Peters, 178; Harrison et al. *v.* Nixon, 9 Id. 483.

are very persuasive to the presumption that the claim of Charles Goodyear, the elder, that he was the original and first inventor, is impregnable. If it were not so, we cannot doubt that it would have been overthrown in the numerous and severe assaults which have been made upon it. We have, however, examined the question by the light of the evidence found in the record, and in the absence of the adjudications referred to should have had no difficulty in coming to the same conclusion. We entertain no doubt upon the subject. The point was not very earnestly pressed upon our attention in the argument at the bar. We deem what we have said in regard to it sufficient.

The patents reissued to the executor upon the surrender of the patent reissued to the testator were numbered respectively 1084 and 1085. The one numbered 1085 is for the process by which vulcanized India-rubber is manufactured. The other one is for the result of the process in the form of the article produced.

It is contended by the appellants that both these patents are invalid, for two reasons—1st, because they are broader than the claims of the patent surrendered by the executor; and, 2d, because one is for a process, and the other for the product of that process. The court below held the objection to the patent for the process—that it is too broad—fatal to its validity, because the claim embraced "other vulcanizable gums" besides India-rubber as articles to which the process was to be applied. From this part of the decree below no appeal was taken by the complainants. It is, therefore, final and conclusive in its effect, and the patent to which it relates must be laid out of view. It remains, therefore, to consider only the patent No. 1084, which is for the product.

The claims of the patent reissued to Charles Goodyear, deceased, in 1849, are as follows:

"What I claim as my invention and desire to secure by letters patent is the curing of caoutchouc, or India-rubber, by subjecting it to the action of a high degree of artificial heat, substantially as herein described, and for the purposes specified.

"And I also claim the preparing and curing the compound

of India-rubber, sulphur, and a carbonate or other salt, or oxide of lead, by subjugating the same to the action of artificial heat, substantially as herein described."

The claim of the patent for the product is thus expressed:

"What is claimed as the invention of Charles Goodyear, deceased, is the new manufacture of vulcanized India-rubber (whether with or without other ingredients), chemically altered by the application of heat, substantially as described."

The specification, among other things, contains these clauses:

"For many purposes the manufacture is improved by the addition of other substances than sulphur, among which white lead is one of the best, and which, when used, may be combined in the mixture above described, in the proportion of seven parts by weight, thereby forming a triple compound. Other salts of lead may be used with advantage, and coloring matter may be also incorporated with the mixture for the purpose of imparting colors to the product.

"And other materials, such as cotton, silk, wool, or leather, may be incorporated or combined with the India-rubber and sulphur, thereby modifying the strength, elasticity, or other qualities of the new manufacture for particular purposes; as it is found that the new substance or product will be produced whenever the essential elements of rubber, sulphur, and heat are used, whether such other materials are incorporated or not."

A patent should be construed in a liberal spirit, to sustain the just claims of the inventor. This principle is not to be carried so far as to exclude what is in it, or to interpolate anything which it does not contain. But liberality, rather than strictness, should prevail where the fate of the patent is involved, and the question to be decided is whether the inventor shall hold or lose the fruits of his genius and his labors.* The surrender was made by the executor, for the reason that the specification was defective and required amendment. This the law permitted, if the facts brought

---

* Corning *v.* Burden, 15 Howard, 269; Battin *v.* Taggert, 17 Id. 74.

the case within the provisions of the statute. The commissioner was charged with the duty of examining the facts and deciding upon the application. His judgment is shown in the results. Upon comparing the context of the specifications of the surrendered and of the reissued patent, and giving to each a reasonable interpretation, we are satisfied that the decision was correct, and we see no reason to reverse it. It is the right of the patentee and his representatives to enlarge or restrict the claim, so as to give it validity and secure the invention.*

Patentable subjects, as defined by the patent law,† are "any new and useful art, machine, manufacture, or composition of matter, or any new and useful improvement on any art, machine, manufacture, or composition of matter." A machine may be new, and the product or manufacture proceeding from it may be old. In that case the former would be patentable and the latter not. The machine may be substantially old and the product new. In that event the latter, and not the former, would be patentable. Both may be new, or both may be old. In the former case, both would be patentable; in the latter neither. The same remarks apply to processes and their results. Patentability may exist as to either, neither, or both, according to the fact of novelty, or the opposite. The patentability, or the issuing of a patent as to one, in nowise affects the rights of the inventor or discoverer in respect to the other. They are wholly disconnected and independent facts. Such is the sound and necessary construction of the statute.

This objection to the patent, we think, is also not well taken.

Can we go behind the action of the commissioner in extending the patent and inquire into the frauds by which it is alleged that the extension was procured? The fifth section of the act of 1790‡ provided for the repeal of patents under the circumstances and in the manner specified. This act was

---

* Battin *v.* Taggert, 17 Id. 84            † Act of 1836, § 6.
‡ 1 Stat. at Large, 109.

repealed by the act of 1793.*   The tenth section of that act re-enacted the fifth section of the act of 1790.   The fifth section of the latter act authorized substantially the same defences in suits upon patents which are allowed by the 15th section of the act of 1836, with the further provision, that if the facts touching either defence were established, "judgment shall be rendered for the defendant with costs, and the patent shall be declared void."   This act continued in force until it was repealed by the act of 1836.   These provisions were not then, and they have not since been, re-enacted. The 16th section of the act of 1836 authorizes a court of equity, in cases of interference, to take jurisdiction and annul the patent issued to the party in the wrong.   Beyond this the patent laws are silent upon the subject of the exercise of such authority.   This review furnishes a strong implication that is was the intention of Congress not to allow a patent to be abrogated in any collateral proceeding, except in the particular instance mentioned, but to leave the remedy in all other cases to be regulated by the principles of general jurisprudence.   To those principles we must look for the solution of the question before us.   The subject was examined by Chancellor Kent with his accustomed fulness of research and ability, in *Jackson* v. *Lawton.*†   He there said: "Unless letters patent are absolutely void on the face of them, or the issuing of them was without authority, or was prohibited by statute, they can only be avoided in a regular course of pleading, in which the fraud, irregularity, or mistake is regularly put in issue.   The principle has been frequently admitted, that the fraud must appear on the face of the patent to render it void in a court of law, and that when the fraud or other defect arises on circumstances, *dehors* the grant, the grant is voidable only by suit.‡   The regular tribunal is chancery, founded on a proceeding by *scire facias* or by bill or information."   The patent in that case was for land, but, as regards the point here under consideration,

---

* 1 Stat. at Large, 318.                    † 10 Johnson, 23.
‡ 1 Hening & Munford, 19, 187; 1 Munford, 134.

there is no distinction between such a patent and one for an invention or discovery. If there be, the case is stronger as to the latter. In the case of *Field* v. *Seabury*,* the patent was also for land. This court ruled the point in like manner, and the same remarks apply. Viewing the subject in the light of the principle involved, we can see no defect in the parallelism between that case and the one before us.

The extension was granted by the commissioner pursuant to the first section of the act of 1848 and the eighteenth section of the act of 1836. The latter declares that upon the making and recording of the certificate of extension " the said patent shall have the same effect in law as though it had been originally granted for the term of twenty-one years." The law made it the duty of the commissioner to examine and decide. He had full jurisdiction. The function he performed was judicial in its character. No provision is made for appeal or review.† His decision must be held conclusive until the patent is impeached in a proceeding had directly for that purpose according to the rules which define the remedy, as shown by the precedents and authorities upon the subject. We are not, therefore, at liberty to enter upon the examination of the evidences of fraud to which we have been invited by the counsel for the appellants. The door to that inquiry in this case is closed upon us by the hand of the law. The rule which we have thus laid down is intended to be limited to the class of cases to which, as respects the point in question, the one before us belongs. We decide nothing beyond this.

The proof of infringement makes a case so clear for the appellees, in our judgment, that it is deemed unnecessary to extend this opinion by discussing the subject.

It is unnecessary to consider the respective rights of the several corporation complainants in this litigation, because it is clear that such as do not belong to them are vested in Charles Goodyear, the executor, by virtue of his holding the entire legal title of the patent.

---

* 19 Howard, 332.         † Foley *v.* Harrison, 15 Howard, 448.

The appellants meet the case in the aspect of infringement, by setting up a license from Charles Goodyear, deceased, to E. M. Chaffee, bearing date on the 25th of June, 1846, which they insist is a complete bar to the relief sought by the bill. This instrument gives to Chaffee, " his executors, administrators, and assigns, a free license to use the said Goodyear's gum-elastic composition for coating cloth for the purpose of japanning, marbling, and variegate japanning, at his own establishment, but not to be disposed of to others for that purpose without the consent of the said Charles Goodyear; . . . . . the right and license hereby conferred being limited to the United States, and not extending to any foreign country, and not being intended to convey any right to make any contract with the government of the United States."

There are several objections to the view taken of this license by the counsel for the appellant. It authorizes Chaffee to use it himself. It gave him no right to authorize others to use it in conjunction with himself, or otherwise, without the consent of Goodyear, which is not shown, and not to be presumed. It was to be used at his own establishment, and not at one occupied by himself and others. Looking at the terms of the instrument, and the testimony in the record, we are satisfied that its true meaning and purpose were to authorize the licensee to make and sell India-rubber cloth, to be used in the place, and for the purposes, of patent or japanned leather. In our judgment it conveyed authority to this extent and nothing more. The practical construction which the parties themselves have given to a contract by their own conduct is, in cases of doubt, always entitled to great weight. That this practical construction, in the case before us, was in accordance with that which we have given to the instrument, is clearly shown by the following facts: The defendants, Chaffee, Bourne, and Brown, were hostile to the extension, and collected evidence to defeat it. If they had understood the license then, as they construe it now, their interest would have prompted an opposite line of conduct. In 1856, Goodyear the elder, and others, sued Brown,

Bourne, and Chaffee for an infringement of the patent re-issued to Goodyear—by manufacturing India-rubber shoes. In September of that year, they filed their answer. The license, as they now construe it, would have been conclusive against the complainants. The answer is long and elaborate. It makes no allusion to the license. An absolute injunction was decreed. The Chaffee license bears date in 1846. In 1858, the same defendants procured a license to manufacture rubber shoes, from Haywood. The terms were stringent and onerous. This license would have been useless, if their present construction of the license to Chaffee is correct. It is not clear that any interest was conveyed by Chaffee to the other parties, if ever, until since the commencement of this suit. The claim was not heard of before the conflict began. The license sets forth in express terms, that it was not intended to give any authority to contract with the United States. All the articles to which this controversy relates, were manufactured for the United States, under contracts with the quartermaster-general. This defence cannot avail the defendants.

Upon looking further into the record we find that the complainants took seven exceptions, and the defendants twenty-eight, to the master's report in the court below, all of which, on both sides, were overruled. The complainants not having appealed, their exceptions are not open to examination. Our attention, therefore, will be confined to those taken by the defendants, who have brought them before us by this appeal. Many of them relate to the findings of the master upon questions of fact. Others are predicated of facts which, upon examination, are not found to be as the exceptions assume. In all these cases we are satisfied with the master's conclusions, and do not propose to review them. We shall dispose of such other points arising upon the report, as we deem it proper to remark upon, without adverting particularly to the exceptions by which they are raised.

In taking the account the master was not limited to the date of the decree. In such cases, it is proper to extend the

account down to the time of the hearing before him, unless the infringement ceased prior to that time. The rights of the parties are settled by the decree, and nothing remains but to ascertain the damages and adjudge their payment. The practice saves a multiplicity of suits, time, and expense, and promotes the ends of justice. We see no well-founded objection to it.

The thirteenth section of the act of March 2d, 1861, requires " that every article made or sold under the protection of a patent shall have fixed upon it the word ' patented,' and the day and year when the patent was granted; and when, from the character of the article, that may be impracticable, a label on which a notice to the same effect is printed shall be attached;" and if this be not done it is declared " that in case of suit for infringement, brought by the person failing so to mark the articles, no damages shall be recovered by the plaintiff except on proof that the defendant was duly notified of the infringement, and continued, after such notice, to make and vend the articles patented," &c.   It is said that the bill contains no averment on this subject, and that the record is equally barren of proof that any such notice was ever given to the defendants, except by the service of process, upon the filing of the bill.   Hence, it is insisted that the master should have commenced his account at that time, instead of the earlier period of the beginning of the infringement.   His refusal to do so was made the subject of an exception.   The answer of the defendants is as silent upon the subject as the bill of the complainants.   No such issue was made by the pleadings.   It was too late for the defendants to raise the point before the master.   They were concluded by their previous silence, and must be held to have waived it.   It cannot be considered here.   We refer to the authorities cited in an earlier part of this opinion, in support of the rule upon this subject.

The Circuit Court decreed that the **Providence Company** was liable " for all the profits made in violation of the rights of the complainants, under the patent aforesaid, by respondents, by the manufacture, use, or sale of any of the articles

named in said bill." This was in accordance with the rule in equity cases established by this court.* It was not objected to in the argument here, but it was strenuously insisted that the master had erred in his application of the rule, and the court in confirming his conclusions. We have examined the report and are satisfied that he discharged his duty with exemplary care and diligence. The report is characterized by unusual ability. He has stated two accounts: one against the Providence Company and the other against the Columbian Company, which he finds to be the Providence Company under another name.

The Providence Company manufactured articles covered and articles not covered by the patent in question. No separate account was kept as to their respective cost and profit. The business as to both was so intermingled and confused that approximate results only were possible, and these were attainable by but one process. He applied the principle of apportionment as follows:

The gross amount of sales of articles of both classes was $2,648,131.49. The gross amount of sales of articles covered by the patent, $1,899,696.78. Gross amount of profits, $349,520.02. Proportion of profits due to articles covered by the patent, $250,757.72. The master reports that this result approaches exactness, and that it is favorable to the defendants. The Columbian Company manufactured only patented articles. Its books were properly kept. The data were clear and certain, and he had no difficulty in reaching a satisfactory conclusion. He found the amount of profits to be $60,000.

| | |
|---|---|
| Profits of the Providence Company, . . . | $250,759 72 |
| Profits of the Columbian Company, . . . | 60,000 00 |
| Total for which the defendants are liable, . | $310,757 72 |

In making up the account the master allowed deductions from profits, for bad debts, for rents, and interest paid--debiting rents and interest received; he allowed for the

---

* Livingston *v.* Woodworth, 15 Howard, 546; Dean *v.* Mason, 20 Id. 198

market value of the materials on hand when the infringement began, for the cost of those acquired afterwards to carry on the business, and for the usual salaries of the managing officers. In this connection we take the following paragraph from the report:

"Large amounts appear by the books to have been expended in repairs of building and machinery, and in the purchase of new machinery, tools, and fixtures. No further allowance is made by the master for wear, and tear, and depreciation."

He refused to allow the extraordinary salaries which it appeared by the books had been paid, being satisfied they were dividends of profit under another name, and put in that guise for concealment and delusion. The allowance for repairs and other items mentioned in this connection doubtless exceeded the wear and tear which could have occurred during the time of the infringement. He refused to allow the value, at the time they were used, of materials bought for the purposes of the infringement. The market was a rising one. The defendants had the benefit of it as to those which were untainted by dishonesty. Those bought later stand upon a different footing. The claim is entitled to no especial favor. There must be a fixed rule. There can be none better than the cost as to those to which that principle was applied. The articles might have fallen in value instead of rising. The defendants cannot complain, as they are held liable only for the ultimate profits of the piracy.

He refused to allow the profits due to elements not patented, which entered into the composition of the patented articles. There may be cases in which such an allowance would be proper. This is not one of them. The manner in which the books of the Providence Company were kept renders such an account impossible as to the business done in their name.

The conduct of the defendants in this respect has not been such as to commend them to the favor of a court of equity. Under the circumstances, every doubt and difficulty should

be resolved against them.* The allowance was properly denied.

He refused to allow manufacturer's profits and interest on the capital stock. This was correct. "The profits made in violation of the rights of the complainants" in this class of cases, within the meaning of the law, are to be computed and ascertained by finding the difference between cost and yield. In estimating the cost, the elements of price of materials, interest, expenses of manufacture and sale, and other necessary expenditures, if there be any, and bad debts, are to be taken into the account, and usually nothing else. The calculation is to be made as a manufacturer calculates the profits of his business. "Profit" is the gain made upon any business or investment, when both the receipts and payments are taken into the account.† The rule is founded in reason and justice. It compensates one party and punishes the other. It makes the wrong-doer liable for actual, not possible, gains. The controlling consideration is, that he shall not profit by his wrong. A more favorable rule would offer a premium to dishonesty, and invite to aggression.

The jurisdiction of equity is adequate to give the proper remedy, whatever phase the case may assume; and the severity of the decree may be increased or mitigated according to the complexion of the conduct of the offender. We find no error in the record, and the decree of the Circuit Court is

AFFIRMED.

NOTE.—BRADLEY and STRONG, JJ., had not taken their seats upon the bench when the preceding case was argued and decided.

---

* Lupton *v.* White, 15 Vesey, 432; Copeland *v.* Crane, 9 Pickering, 79; Dexter *v.* Arnold, 2 Sumner, 109; Miller *v.* Whittier, 36 Maine, 585.

† People *v.* Super Niag., 4 Hill, 23.