### JONES v. UNITED STATES.

No. 46969.

United States Court of Claims.

Oct. 2, 1951.

656

Floyd H. Crews, New York City (Thurman Arnold, Washington, D. C., Russell G. Pelton and Darby & Darby, all of New York City, on the briefs), for plaintiff.

H. L. Godfrey, Washington, D. C., and Newell A. Clapp, Acting Asst. Atty. Gen., for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and HOWELL, Judges.

HOWELL, Judge.

This is a suit to recover for the alleged infringement of United States letters patent No. 2,078,854, issued to plaintiff on April 27, 1937, on an application filed in the Patent Office June 20, 1936. Plaintiff is the owner of the entire right, title, and interest to the patent which is entitled "Boundary Layer Air Control."

The defendant contends that insofar as the claims here in issue are involved, the patent is not infringed, and that certain of the claims are invalid in view of the prior art.

The essential facts established by the record in this case are fully set forth in the findings, and except for certain controverted issues hereinafter discussed, it is unnecessary to refer to them in detail.

The patent in suit, which will be more fully described below, relates both to a method and a mechanism for removing the boundary air layer adjacent to the airfoil surfaces of an airplane wing.

Friction is present in the air when the individual particles thereof either move relative to each other or relative to a surface. When an airplane wing moves through the air the thin layers of air immediately adjacent thereto tend to move with it at substantially the same speed because of this frictional effect. If the air is contemplated as being in a number of thin layers, each outward layer has less forward motion imparted to it from the inner layer until an outer layer is reached which does not partake of any of the forward motion of the wing. This outer layer of air contains no turbulence as a result of the forward motion of the airplane wing. The air thus affected is known to those skilled in the

aeronautic art as the boundary layer and is technically defined as "a layer of fluid, close to the surface of a body placed in a moving stream, in which the impact pressure is reduced as a result of the viscosity of the fluid."

Characteristics of the boundary air layer are well known and are capable of both measurement and computation. The thickness of the boundary air layer is, of course, dependent upon such factors as speed through the air of the airfoil or wing, the shape of the airfoil, the altitude and the angle of the wing relative to the air. In an example given in finding 5, the thickness of the boundary air layer on a B–17 wing section (one of the alleged infringing Government airplanes), flying at a speed of 250 miles per hour, at an altitude of 20,000 feet, varies from a few thousandths of an inch in the front edge of the wing to a maximum of about 6 inches at the rear thereof. We have referred somewhat in detail to the conventional boundary air layer because in the patent in suit the patentee expresses a different concept of boundary air layer.

The Jones patent in suit relates both to a method and mechanism for removing the boundary air layer adjacent the airfoil surfaces by sucking it in through spanwise slots, compressing it by means of a power-operated compressor driven by the engine, and then ejecting the compressed air into a different pressure zone through other spanwise slots. The engine-operated blower has its speed controlled by means of a gear shift or selective speed mechanism similar to that employed on automobiles except that the gears are shifted or selected by a mechanism responsive to the relative speed of travel of the airplane through the air. The Jones patent also has a speed responsive device actuated by the relative speed of the airplane through the air which simultaneously actuates the valves that open and close entrance and exist spanwise slots located at various points on the surface of the airplane wing.

Findings 7 to 11, inclusive, describe the Jones patent disclosure in detail, and it is unnecessary to further discuss them other than to call attention to the Jones theory of boundary air layer which appears to be inconsistent with this phenomena as it is recognized and treated by those skilled in aeronautical art. The Jones theory is that as the airfoil or wing moves through the air it displaces a mass of air equal in volume to that of the wing, and that as the wing progresses through the air, a similar volume of air is displaced each time the wing moves forward chord length (a distance equal from the front to the rear of the wing). According to the Jones theory the boundary air layer is much larger for a thick wing than a thin wing, and is a quantity not dependent upon air friction or altitude. Even to one unskilled in aeronautical art, it is apparent that under the Jones theory the compressor in the wings and the entrance and discharge slots would all have to be of such a large capacity that the airplane would literally suck its way through the air. Whether such concept of boundary air layer is correct or not is immaterial as long as the patentee has defined it in such a manner that it is understandable.

See White v. E. L. Bruce Co., 3 Cir., 162 F.2d 304, 307: "We are not holding the patentee to the correctness of his scientific explanation of the result achieved. He is not bound by his theory."

In the present situation, however, certain of the claims in suit, i. e., claims 1, 3, and 7, call for the removal of the boundary air layer, and obviously the monopoly expressed by such claims would require the removal of the boundary air layer, as Jones has defined it, rather than the removal of the conventional and relatively thin boundary air layer. Other claims in suit specify removal of portions only of the boundary air layer volume.

The defendant's structures alleged to infringe comprise three different types of airplanes—the Boeing B–17, the Republic P–47, and the Lockheed P–80. The structure and operation of these three airplanes are described in findings 15 to 25, inclusive, and it is therefore only necessary to refer to them briefly in this opinion. In all three instances these airplanes have openings either in the forward edge of the wing or near the front end of the fuselage, the purpose of these openings being either to re-

ceive air and compress it by means of a power actuated blower to supply oxygen for the fuel charge of the engines, or to supply air under its natural pressure for cooling purposes.

Referring to the B–17, this airplane is equipped with four engines, two being mounted on each wing. Adjacent each engine are three rectangular openings in the front edge of the wing. The first of these openings supplies air for the fuel charge to a rotary compressor driven by a turbine operated by the exhaust gases from the engine. This compresses the air and delivers it to the engine. The speed of the compressor is controlled not by the speed of the airplane or the engine but by an automatic device which responds to the altitude of the plane and causes air to be compressed in accordance with the altitude, supplying more air at the higher altitudes because of the thinner oxygen content of the air.

The second opening provides a natural flow of air through an intercooler, the function of which is to cool the air on its way from the compressor to the engine. After passing through the intercooler this cooling air is dumped into the interior of the wing and escapes through a number of slots in the rear thereof. The third opening merely supplies air under natural pressure to an oil cooler, this air also being dumped into the interior of the wing and escaping through the slots in the rear thereof. No blower is utilized to force the waste air in the interior of the wing out through these slots, and this air will cause turbulence rather than eliminate it.

The Republic P–47, is a single-engined plane with the engine located in the front end of the fuselage. There are no slots in the wings of this plane, but the power plant is similar in function and operation to the power plants utilized in the B–17. The air for the fuel charge and for cooling the compressed air and the oil is received through openings at the front end of the fuselage just behind the propeller. The air passing through the intercooler and the oil cooler escapes under its natural remaining pressure through openings in the sides of the fuselage.

The plaintiff contends that a "compensating valve" is present to discharge high pressure air out of the air supply system extending between the supercharger or compressor and the engine in the B–17 and the P–47 airplanes. The weight of evidence in this case fails to establish the presence of such a valve.

The Lockheed P–80, is an airplane of the jet propulsion type, the power plant consisting of a rotary air compressor directly driven by a gas turbine mounted on the same shaft. Air is received by two air scoops located on each side of the fuselage and fed to the compressor. Fuel is then injected into the air in a combustion chamber and the products of combustion fed to the turbine, after which they escape through a tail pipe at the rear end of the fuselage at high velocity and form the jet blast which drives the airplane forward. In this construction there is present a device to prevent boundary air layer from entering the air scoops, for between the fuselage and the air scoops are located a series of small ducts to catch the boundary air layer and lead it elsewhere under its own pressure. (See finding 25.) Thus, the air scoops are located sufficiently far out from the fuselage to purposely prevent them from receiving boundary air layer which is not wanted because its velocity has been slowed down due to friction.

A comparison of the accused structures with the claims in suit is next in order. The record discloses only a constructive reduction to practice by the plaintiff when he filed his patent application which materialized into the patent in suit, and there is no evidence of the existence of any license or the construction by plaintiff, other than some models, of any airplane embodying the disclosure of the patent in suit.

The prior art cited by the Government and referred to in detail in findings 26 to 35, inclusive, shows numerous prior attempts to treat boundary air layer by drawing it in through slots in an airfoil surface and forcibly ejecting the air through other slots at a velocity greater than the velocity of the boundary air layer. We are here dealing with a paper patent in a crowded field and the claims must be rather

narrowly construed in the light of the specification. See Yates v. Jones, 4 Cir., 176 F.2d 794.

Claims 1, 3, 7, 9, 10, 11 and 18 in suit are alleged to be infringed by all three types of defendant's airplanes. In addition, claim 15 is alleged to be infringed by the Lockheed P-80 and claim 16 by the Republic P-47.

When the Jones application was pending before the Patent Office, certain of his originally filed claims were rejected in view of prior art. Jones acquiesced in this rejection and substituted claims of a more limited character, among which was the claim which ultimately became claim 1 of the patent. At the time of filing this amendment, Jones stated in connection therewith: "Claims 1 to 4 have been replaced by claims 24 and 25 which clearly avoid the references of record, both as to the structure and result. No reference of record discloses the idea of removing boundary layer air volume substantially over the entire span of an airfoil from and at a point adjacent a normal or subatmospheric pressure zone, compressing this volume, and discharging same at high velocity into a superatmospheric pressure zone to remove stagnated boundary layer air from the latter zone."

The phraseology of claim 1 is limited to removal of the boundary layer volume over substantially the entire span of an airfoil. This same limitation also appears in claims 3, 7 and 18. See Smith v. Magic City Club, 282 U.S. 784, 51 S.Ct. 291, 293, 75 L.Ed. 701, in which Chief Justice Hughes stated as follows: "The case, in our opinion, thus calls for the application of the principle that where an applicant for a patent to cover a new combination is compelled by the rejection of his application by the Patent Office to narrow his claim by the introduction of a new element, he cannot after the issue of the patent broaden his claim by dropping the element which he was compelled to include in order to secure his patent."

■ Referring to the B-17, the total span of all six openings in the wing for the admission of air approximates only 10 percent of the entire span of the wing.

Even if these openings were for the function of removing and treating the boundary air layer, and we have already indicated that this is not their purpose, claims 1, 3, 7 and 18 are not infringed because of the limitation just referred to. Noninfringement based upon this limitation makes unnecessary any extended discussion of whether these small openings would remove the large volume of air displaced by the entire wing as contemplated by the Jones theory. We are of the opinion they could not.

We next refer to the P-47 in connection with this group of claims. This is the single-engined airplane with the engine and power plant located in the nose of the fuselage. A fuselage is known to those in the aeronautical art as an elongated and more or less cylindrical body housing the power plant, its accessories, and the pilots and passengers. Its front end is somewhat rounded and it tapers more or less to a point at the rear end, having a streamlined contour to reduce its resistance. It has neither a leading edge nor a trailing edge, nor does it possess a span in the sense that this term is used in aeronautics as applied to a wing. The only opening at the front of the fuselage in the P-47 through which air is received and compressed is an inverted "V" shaped opening located at the bottom of the front end of the fuselage, and the air here received is for the sole purpose of forming the fuel charge for the engine.

This group of claims (1, 3, 7 and 18) are not infringed because of the limitations just referred to.

What we have said with respect to the P-47 also applies with respect to the noninfringement of these claims by the P-80 in which air for forming the fuel charge is received by two scoops located on the forward end of the fuselage and extending outwardly therefrom like a pair of protrudent ears.

Referring next to claim 9, this claim carries the following limitation: "selectively removing portions of boundary layer air volume from adjacent either the upper airfoil surface or the leading edge thereof."

This phrase, interpreted in the light of the Jones specification, has reference to a series of ducts and valves by which slots located in one portion of the airfoil may be closed, and slots located in another portion may be opened. None of the accused structures have such devices, and this claim is not infringed.

Claim 10 includes the following limitation: "means responsive to increase in speed of the aircraft for increasing the speed of the blower and the rate of discharge of the boundary layer air volume."

By reference to the Jones specification, this structure is the mechanism which changes the speed ratio between the blower and engine in accordance with variations in the speed of the airplane as it moves through the air. As we have already stated, with respect to the B–17 and the P–47, the speed of the supercharger is controlled by the altitude of the plane and not its speed.

In the case of the P–80 airplane, the compressor for the air for the fuel charge is directly driven and is on the same shaft as the rotor of the gas turbine. The speed of the compressor is not responsive to the speed of the airplane but is controlled by the amount of fuel fed to the combustion chamber, which in turn is controlled by the pilot through the throttle setting. This distinction may be emphasized by indicating that the airplane when climbing under full throttle would have a much relatively lower air speed than when diving with the throttle set toward the closed position.

This claim further calls for an airfoil section, a blower, and means for inducing a portion of the boundary layer air volume from a point adjacent an exterior surface of the airfoil section. We have already pointed out that the P–80 is structurally designed to eliminate the boundary air layer. This claim is not infringed.

Claim 11 is based upon claim 10 and merely adds thereto by way of limitation certain spanwise slots. For the reasons stated in connection with claim 10, this claim is not infringed by any of the Government airplanes.

Claim 15, which the plaintiff alleges to be infringed by the P–80 airplane, also adds certain limitations to claim 10 by specifying a selective gear transmission means connecting the motor to the blower and means responsive to changes in air speed for controlling the transmission means. No such structure is present, and for the reasons already stated, the P–80 structure does not infringe this claim.

Plaintiff alleges that claim 16 is infringed by the P–47. This claim is limited in scope and specifies such elements as transfer slots located substantially over the entire span of the airfoil section, with a conduit connecting each slot to the blower, a valve in each conduit, and means for simultaneously operating said valves. There is no such structure present in the P–47 and this claim is not infringed.

Various other limitations occur in the claims in issue which point to noninfringement. These distinctions are set out in detail in findings 36 to 51, inclusive, in which the claims are paraphrased, and, except to state that these findings are supported by the record, it is unnecessary to reiterate them in detail here.

Referring again to claim 9 in suit, this claim is directed to selectively removing portions of boundary air layer volume, either adjacent the upper airfoil surface or the leading edge thereof. We refer to the prior art Martin patent (finding 38) which shows two spanwise slots in the leading edge of the wing connected to a blower chamber. Both inlet openings are provided with valves by means of which the pilot can selectively open and close them. This claim is invalid. (See finding 54.)

In the over-all picture presented by this case, there comes to mind the analogy of the automobile which is provided with a grille at the front for admitting air under the hood. The function and purpose of the air thus admitted is to provide air for the carburetor, which forms the engine fuel charge, and for cooling purposes, and not for reducing air friction on the body of the car as it travels along the highway. Formation of the fuel charge and cooling of the mechanism are similarly the sole functions for the air inlets in the three Government structures.

For these reasons we are of the opinion that the claims here in issue are not infringed, and claim 9 is invalid. The petition is accordingly dismissed.

It is so ordered.

JONES, Chief Judge, and MADDEN, WHITAKER, and LITTLETON, Judges, concur.