Davis, Judge,
delivered the opinion of the court:[1]
This is a patent suit under 28 U.S.C. § 1498, in which recovery is sought for reasonable and entire compensation for the unlicensed use by or for the Government of patented inventions. Plaintiff, a corporation of Ontario, Canada, is the record owner of United States Letters Patent Nos. 2,330,142 and 2,330,143 (referred to as the ’142 and ’143 patents), naming Lloyd Montgomery Pidgeon as inventor, and issued to plaintiff on September 21, 1943. These patents relate to methods and apparatus for obtaining magnesium, and, in *242 the case of ’142, other volatizable metals.[2] Plaintiff contends that one claim of the ’142 patent and three claims of the ’143 patent have been infringed by defendant’s use of magnesium-producing plants located at Canaan, Connecticut; Wingdale, New York; and Manteca, California.[3] Defendant’s position is that the patents are invalid and have not been infringed. We have concluded that the patents, properly construed, were not infringed by the defendant’s operation of the accused magnesium-producing plants. Since that result disposes of the question of liability, we need not consider the numerous arguments advanced by the parties pertaining to the validity of the patents.
Late in 1941, efforts were made to increase the production of magnesium metal previously obtained in commercial quantities by electrolytic processes. In November 1941, representatives of defendant’s Bureau of Mines and Office of Production Management visited Dr. Lloyd M. Pidgeon in Ottawa and inspected his pilot plant operations utilizing retorts for producing magnesium by thermal processes. Subsequently, plaintiff’s consulting engineers were released by plaintiff to defendant to aid in the Government’s construction and operation of magnesium-producing plants at Canaan, Wingdale, and other locations in the United States. Upon the grant of its ’142 and ’143 patents in 1943, plaintiff asserted a claim against defendant. A settlement of this 1943 claim was reached in 1949 under which plaintiff received $125,000 from the defendant for all designs, plans, drawings, constructions, operating and maintenance instructions, engineering data, details, services, trade secrets, inventions or technical information, etc., furnished by plaintiff to the United States and relating to the production of magnesium by the ferrosilicon retort process. The settlement agreement specifically provided that it was not to be construed as a license for continuing operation under any patent owned by plaintiff. The present suit is directed against defendant’s *243 operation of its magnesium plants since the 1949 agreement and more particularly for operations during the period of the Korean hostilities. Patents ’142 and ’143 expired in 1960.
The patents relate to apparatus and methods for volatilizing and condensing magnesium under low pressure and high heat in metal retorts. Each patent refers to a thermal reduction operation for producing metal vapors which are then condensed in a cooled portion of the apparatus. A fuller description of the apparatus and methods disclosed and claimed in the ’142 and ‘143 patents is given in the findings. Briefly stated, the method in general includes placing a charge of magnesium-containing material in the heated zone of a tubular metal retort within a furnace, closing and evacuating the retort, condensing magnesium in a removable condenser sleeve positioned in a cooled zone of the retort outside of the furnace, opening the retort for removing the sleeve containing condensed magnesium, and repeating the cycle. Both patents describe the use of a fractionating means or condenser within the removable condensing sleeve, consisting of a series of spaced metal discs or plates which provide a circuitous or relatively long path of travel for vapors. This fractionating condenser is designed to condense metals of relatively high vapor pressure, such as sodium, separately from the magnesium, and to provide a means of removing those metals independently of the magnesium. By achieving a substantial separation of the magnesium condensate from the condensates of more volatile metals, the fractionating condenser not only makes possible the production of high-purity magnesium, but also reduces the likelihood of ignition of the magnesium, caused by burning of more readily combustible sodium and pyrophoric magnesium during discharge of the condenser.
With reference to the fractionating condenser, the specification of the ’143 patent states that the innermost disk — the disk closest to the hot, or reduction, end of the retort — is “out of thermal contact with the condenser wall and remains at a higher temperature than the other disks.” This innermost disk of the condenser, sometimes referred to by counsel as the “vital plate,” serves to deflect to the wall of the re *244 movable condenser sleeve the magnesium vapors impinging thereon. The specification also states that this disk, “being out of direct thermal contact with the condenser wall and remaining hot, insures deposition of the magnesium only on the wall of the removable condenser, where it builds up into a unitary structure with an inwardly projecting ledge.” The ’142 specification, in describing the series of spaced plates used in the apparatus, states that the innermost of the plates is of a lesser diameter than the retort, and “is substantially independent of the cooler and in operation does not accumulate condensate.”
In the normal operation of the apparatus illustrated in the ’142 and ’143 patents, magnesium does not condense on this vital plate. The magnesium vapor deflects off the hot vital plate and condenses on the wall of the condenser sleeve between the vital plate and the furnace end of the sleeve. The sodium vapor, which has a higher vapor pressure than magnesium and requires a colder surface for condensing, passes around the edge of the vital plate and condenses beyond the magnesium condensing zone. When the evolution of vapors from the material with which the furnace is charged is completed and the vapors have been condensed, the vacuum is broken and the retort and condenser sleeve are opened. The fractionating condenser is then removed, carrying with it any pyrophoric metal fraction which most readily ignites when hot upon exposure to air, and which, if not removed, would be likely to ignite the hot magnesium in the condenser sleeve. The removable sleeve, containing the pure magnesium fraction, is then removed without the necessity of further cooling to avoid ignition. After removing the residue of the charge from the retort, the retort is ready for a new charge, a new condenser sleeve, and replacement of the fractionating condenser and closure members.. The method of operation taught by the patents makes it possible to repeat the cycle without successively heating and cooling down the retort, thus prolonging its useful life and avoiding heat loss.
One prime question is the state of the prior art in this field. Numerous patents and publications relating to apparatus and methods for the production of magnesium by thermal action were available prior to November 3, 1941, and February 11,
*245 1942, the respective filing dates of the ’142 and ’148 patent applications. These include Bakken patent, 1,594,348, in 1926, British patent 270,060 in 1927, the Hérenguel articles spanning the years 1980 through 1936, and the Kaufmaim article in 1931, all relating to volatilizing and condensing magnesium, and French patent 851,990 in 1939, van Embden patent 2,252,052 filed in 1939, Amati patent 2,258,374 filed in 1940, and French patent 867,763 in September 1941, relating to the thermal reduction of magnesium compounds. Pertinent prior art relating to the production of zinc by thermal reduction included the Hofman article in 1922 and Frólich patent 629,008 in 1899.[4] Plaintiff challenges the inclusion of French patent 867,763 with the relevant prior art, claiming entitlement to a date of invention earlier than the September 1, 1941, reference date of the French patent. Plaintiff is concededly entitled to a time no later than October 22,1941, as the date of invention, this being the date of an application by plaintiff for Canadian letters patent. 35 U.S.C. § 119. But plaintiff contends that it may prove a date of invention in August 1941 — ahead of the patent application filing dates— by evidence of successful reduction to practice in Canada prior to filing the patent applications. In plaintiff’s view, this allegation, if borne out by the proof, would bar consideration of the French patent as an element of the prior art; the argument is that 35 U.S.C. § 104, precluding the establishment of “a date of invention by reference to knowledge or use thereof, or other activity with respect thereto, in a foreign country,” is inapplicable to plaintiff since this prohibition was first added to the patent law in 1946, after the application for and issuance of the patents in issue. We need not, however, resolve the issue of law raised by defendant’s objection to evidence of prior reduction to practice in Canada. The Trial Commissioner, who admitted the evidence, found (finding 55) that it “is not sufficient to warrant a finding that the pilot operations in Canada during August 1941 *246 included each and every feature of the ’142 and ’143 patent claims in suit, or that the experiments in August 1941 amount[ed] to a successful reduction to practice of the alleged inventions here in suit.” On review of the record, we hold that this finding must be sustained. Inclusion of French patent 867,163 along with the prior art is therefore proper.
Of the four particular patent claims remaining in the case, three (numbers 27 of ’142, and 18 and 19 of ’143) claim methods or processes for the production of metallic magnesium by direct thermal reduction.[5] The fourth claim, number 20 of patent ’143, makes claim to an apparatus for the production of magnesium.[6] These patent claims, when meas *247 ured by the prior art, indicate that the field is a crowded one. The state of the prior art was such that, with the possible exception of the fractionating condenser placed within the removable condenser sleeve, the elements of the claims now in issue were taught by the prior art, and thus lack the novelty requisite to a patentable invention. 35 U.S.C. § 101. As the parties recognize when they direct the main thrust of their arguments to the construction and operation of the fractionating condenser, our controversy must be resolved on this specific element of the claimed apparatus, and on the method in which it operates. To what extent were these anticipated by the prior art?
The prior art does reveal the use of fractionating condensers in the purification and extraction of magnesium. Two instances are shown by the Hérenguel series of articles[7] and by French patent 867,763, neither of which was cited by the Patent Office examiner against the applications for the plaintiff’s patents. They illustrate what was denominated the “cold finger” art during the trial. Basically, the cold finger concept is to provide, as part of a furnace or retort, a chamber into which is inserted a cooled tube upon which metal vapor is intended to condense. The apparatus has a set of spaced fins attached to the cold finger so as to be in thermal contact therewith. The periphery of the fins is near but out of contact with the wall of the chamber which surrounds the finned tube. Water is to be circulated inside the tube on which the magnesium is expected to condense, in order to extract the heat of condensation and maintain the tube’s relatively cool state.[8] The French patent states that it can be used for the extraction and purification of metals such as magnesium. The Hérenguel articles pertain to the preparation of pure magnesium by sublimation. The latter claim that separation can be achieved between magnesium and more volatile metals, such as sodium, indicating that magnesium will form, in a *248 substantially hemispheric block, on the hot side of the first fin and on the portion of the condensing tube adjacent thereto, while impure deposits — which may burn spontaneously in air — will form on the parts of the condensing apparatus behind the first fin.
Plaintiff placed in evidence the conclusions of tests it performed, with a view to showing that the cold finger art was incapable of producing satisfactory results. These tests, under the conditions plaintiff used, indicate that the cold finger type of apparatus known to the prior art was not as effective as the patented apparatus in the separate condensation of magnesium from other metals — and, one may infer from the record, not as attractive an operation from a commercial standpoint. The evidence is not convincing, however, that the cold finger apparatus and method were inoperative. To the contrary, it is clear that this portion of the prior art did teach a workable — if crude, when measured by later improvements — method and apparatus based upon a cooled finned condenser which condensed magnesium upon its foremost surface, while vapors of more volatile metals were separately condensed beyond that point. It is in the light of this prior art, very close to plaintiff’s work, that we must interpret and weigh the patents.
Claim 19 of patent ’148, which, with regard to the condensation step, is the most clearly worded of the three process claims, recites the steps of “condensing the vapours within the condenser portion of the retort, retarding and deflecting the flow of said vapours at a point spaced from the outer end of the retort to cause magnesium vapour to condenser [sic] before passing said point, further cooling uncondensed vapours in a zone adjacent the outer end of the retort * * Apparatus claim 20 of the same patent claims an apparatus having, inter alia, a condenser with “a relatively warm zone and a cooler zone, said zones being separated by a vapour deflecting and retarding partition having a vapour passage therethrough * * If they are read without reference to the descriptions, which together with the claims make up the patent specifications, neither of these claims (nor the other method claims) would be sufficient to avoid the charge of anticipation; they would read on the prior art which we have *249 just described and would therefore fall. In the face of this threat of invalidity, the problem is whether it is possible and permissible to interpret the claims so as to avoid the danger.
It is said that patent claims 'are to be construed liberally, but this rule does not mean that the language of a claim is to be given the broadest literal meaning to which it is susceptible. Liberality, rather, must be directed toward supporting the statutory presumption of validity which attaches to every patent (35 U.S.C. § 282), so as to secure to the patentee the just fruits of his true invention. Cf. Klein v. Russell, 86 U.S. (19 Wall.) 433, 466 (1873); Rubber Co. v. Goodyear, 76 U.S. (9 Wall.) 788, 795 (1869). Thus, “where the claim is fairly susceptible of two constructions, that one will be adopted which will preserve to the patentee his actual invention * * McClain v. Ortmayer, 141 U.S. 419, 425 (1891) (emphasis added). In order to construe the claims before us correctly — to determine what was the actual invention, if any, disclosed in the description and claimed by the patentee — we must read the claims in the light of the descriptions and drawings. While a court cannot rewrite a claim (cf. Colgate-Palmolive-Peet Co. v. Lever Bros. Co., 90 F. 2d 178, 194 (C.A. 7, 1937), cert. denied, 302 U.S. 729 (1937)), a reference to the whole specification is often necessary to determine (but not enlarge) the meaning of the claims that will fairly and reasonably be supported both by the language chosen by the patentee and by the actual scope of the invention disclosed. Shick Dry Shaver, Inc. v. Dictograph Products Co., 89 F. 2d 643, 646 (C.A. 2, 1937); Hutzler Bros. Co. v. Sales Affiliates, Inc., 164 F. 2d 260, 263 (C.A. 4, 1947) ; Fowler & Wolfe Mfg. Co. v. McCrum-Howell Co., 215 Fed. 905, 909 (C.A. 2, 1914).
As we have indicated, the ’142 and ’143 patents are in no sense pioneer patents and must — because of the state of the prior art — be narrowly construed if they are to escape the automatic axe of invalidity due to anticipation. Bocjl Corp. v. United States, 120 Ct. Cl. 347, 394, 100 F. Supp. 600, 626 (1951) ; Jones v. United States, 120 Ct. Cl. 747, 799-800, 100 F. Supp. 628, 658-59 (1951); Automatic Devices Corp. v. Sinko, 112 F. 2d 335, 340 (C.A. 7, 1940), aff’d 314 U.S. 94 (1941); Smith v. Mid-Continent Inv. Co., 106 F. 2d 622, 624 *250 (C.A. 8, 1939). So construing the claims in the light of the full descriptions in order to ascertain the true invention, we are led to the conclusion that the claims must be limited to condensing methods and apparatus which utilize a condenser the thermal characteristics of which are such that it remains itself free of magnesium condensate but deflects magnesium vapors to the cooler walls of the condenser sleeve where they condense into a unitary structure, while allowing vapors having a higher vapor pressure to pass on and separately condense in a still cooler zone. Only by such a limited construction will the prior art, which included condensing methods and apparatus in which magnesium vapors were condensed on the foremost cooled surface of a fractionating condenser while vapors of a higher vapor pressure condensed in colder regions of the condenser, be avoided and the claims not subject to being negatived on grounds of anticipation.[9]
Assuming, then, the validity of the claims if they are interpreted in this way,[10] we have the remaining question whether these claims, when construed to avoid the charge of anticipation, were infringed by defendant’s magnesium-producing plants at Canaan, Wingdale, and Manteca.[11] Of course, the claims cannot be construed narrowly, by reference to drawings and specifications, in order to escape anticipation, and then, disregarding this same principle, broadly construed in order to spell out infringement. Wire Tie Machinery Co. v. Pacific Box Corp., 107 F. 2d 54, 55 (C.A. 9, 1939).
Several features exist in common in the various forms of the Canaan-Wingdale and Manteca apparatus and methods, on the one hand, and in the equipment and methods disclosed in plaintiff’s two patents, on the other hand. There are also significant differences. The Government’s operations and *251 equipment are described in detail in tbe findings. We shall discuss only the more salient features of the fractionating condenser apparatus in the accused plants, and their method of operation.
As in the apparatus described in the patents being litigated, the defendant’s plants provide a retort partially within and partially outside a furnace. In the portion of the retort outside the furnace there is a removable condensing sleeve, and within this sleeve near the outer or colder end, but nevertheless spaced from the cover of the retort, is the fractionating condenser apparatus. In the Canaan-Wingdale description this is a “block” or plate having a tubular flange or rim extending away from the furnace end of the retort. The flange serves to hold the block upright. In the Manteca apparatus the condenser is described as a “backplate.” Three types of backplate structures were used at Manteca, two generally comprising a first circular plate and a second circular plate separated by spacing members.[12] Openings are provided through the plates by a series of apertures distributed adjacent the periphery of one of the plates and located centrally in the second plate. The third type of backplate structure included a single imperforate circular plate having an outwardly extending peripheral rim. In every embodiment, the block or backplate is of lesser diameter than the internal diameter of the removable condensing sleeve. The block or backplate rests upon the bottom of the sleeve — in direct thermal contact with it — creating a crescent shaped opening between the inside diameter of the sleeve and the edge of the block or backplate.
In operation, the block in the Canaan-Wingdale condenser and the backplate in the Manteca condenser function similarly. The block or backplate is in thermal contact with the cooled sleeve which surrounds it, and while it may operate at a higher temperature than the sleeve, this temperature is not high enough to prevent the condensation of magnesium directly on the block or backplate as well as on the condenser sleeve. The forward motion of magnesium vapors is stopped completely when the magnesium vapors reach the block or *252 backplate, or any condensate formed thereon. The magnesium vapors which do not immediately condense thereon are retarded and move toward the surrounding condenser sleeve where they condense to form, in conjunction with the magnesium condensing on the block or backplate, a dense unitary coherent mass on the hot side of the condenser partition. Any vapors of a higher vapor pressure than magnesium, such as sodium, will, if present, pass through the opening at the block or backplate and wind up in the space between this partition and the retort cover.
Thus, the function and results achieved by the block or backplate in the accused plants — fractionalization of metal vapors to achieve separate condensation of magnesium and of other metals — are similar to those obtained by the apparatus and methods for which plaintiff claims patent protection. But mere identity of function and result is not sufficient to establish infringement. The test of infringement is tripartite: do the accused operations do the same work, in substantially the same way, and accomplish substantially the same result. Union Paper-Bag Machine Co. v. Murphy, 97 U.S. 120, 125 (1877); Hunt v. Armour & Co., 185 F. 2d 722, 728 (C.A. 7, 1950); Ruth v. Climax Molybdenum Co., 93 F. 2d 699, 703 (C.A. 10, 1937). As we have said, in this instance the claimed methods and apparatus must be construed, in order to avoid anticipation by the prior art, as pertaining solely to condensing methods and apparatus which utilize a condenser the thermal characteristics of which are such that it remains free of the magnesium condensate. When the claims are so construed, it cannot be said that the accused methods and apparatus function in the same way, by the same mode of operation. They function in a different way, departing from the only invention which we find embodied in the plaintiff’s patents. The narrow construction demanded by the prior art precludes us from considering whether, in a less crowded field, the accused methods and apparatus, in which magnesium condenses on the backplate or block of the condenser apparatus as well as upon the condenser sleeve, might be deemed the equivalent of those claimed by the patentee. See Wire Tie Machinery Co. v. Pacific Box Corp., supra, 107 F. 2d 54, 55 (C.A. 9, 1939); *253 Smith v. Mid-Continent Inv. Co., supra, 106 F. 2d 622, 624 (C.A. 8, 1939).
For these reasons, we conclude that Claim 27 of Letters Patent No. 2,330,142, and Claims 18, 19, and 20 of Letters Patent No. 2,330,143, the only claims in issue, have not been infringed by defendant’s accused plants located at Canaan, Connecticut; Wingdale, New York; and Manteca, California. Judgment is entered for defendant and the petition is dismissed.

 At the direction of the court, Trial Commissioner Donald E. Lane prepared an opinion which has been of substantial assistance.

 We shall refer only to use in the production of magnesium, as the ’143 patent is directed specifically to this usage, and the ’142 patent, while claiming broader application, is described with particular reference to its production.

 The petition originally alleged Infringement of ten patents. At this stage of the proceedings, however, plaintiff has withdrawn from consideration all but four of the claims contained in the two above-mentioned patents.

 The prior art is discussed in the findings, and with the exception of the Hérenguel articles and French patent 867,763 will not be detailed here. In considering and construing patent claims, we may consider all relevant prior patents and publications. A court is not precluded from looking at any prior art cited by the Patent Office examiner which is relevant to and which may affect the correctness of the court’s decision on the issues of infringement or validity. Cf. Marconi Wireless Telegraph Co. v. United States, 320 U.S. 1, 44 (1943).

 These claims read:
27. In the production of metallic magnesium by direct thermal reduction under reduced pressure of magnesia containing material, the method which comprises heating the material to form metal vapours in a metal retort disposed within a furnace under normal pressure and with the inside of the retort under subatmospheric pressure with an end portion without the furnace to receive and condense said vapours, cooling said end portion, retarding the flow of said vapours at a point within the condenser adjacent to but removed from the outer end of the condenser portion of the retort to condense therein magnesium vapour to solid form in one zone, further cooling the remaining vapours adjacent the outer end of the retort, discharging the retort while hot in air and recharging the hot retort.
18. A method of producing metallic magnesium by direct thermal reduction which comprises heating, to form metal vapours, magnesium containing material and ferrosilicon under reduced pressure in the reducing portion of a metal retort stationarily located in a furnace with an end of the retort without the furnace, and constituting a condenser portion to receive said vapours, retarding the flow of the vapours in the condenser portion at a point spaced from its outer end to cause the magnesium vapors [sicjl to condense into a coherent structural form and build up at said point spaced from the outer end of the condenser, removing the hot magnesium from the retort in air without ignition, withdrawing the hot residue and recharging the retort while hot.
19. A method of producing metallic magnesium by direct thermal reduction which comprises heating to form metal vapours magnesium containing material and ferrosilicon under reduced pressure in a metal retort disposed within a furnace with an end portion without the furnace for condensing said vapours, condensing the vapours within the condenser portion of the retort, retarding and deflecting the flow of said vapours at a point spaced from the outer end of the retort to cause magnesium vapour to condenser [sic] before passing said point, further cooling uncondensed vapours in a zone adjacent the outer end of the retort, removing the magnesium without ignition at atmospheric pressure, withdrawing the hot residue and recharging the retort while hot.

 Claim 20 of patent ’143 reads:
20. Apparatus for producing coherent masses of magnesium from magnesium containing rock by thermal reduction under reduced pressure with ferrosilicon, comprising a furnace, a plurality of metal retorts having a reducing and volatilizing portion within the furnace and at least one end portion without the furnace constituting a condenser for metal vapours, means for producing reduced pressure within the retorts, each condenser having in operation a relatively warm zone and a cooler zone, said zones being separated by a vapour deflecting and retarding partition having a vapour passage therethrough, and a removable closure for each condenser, said cooler zone being adjacent said closure.

 In the 1930’s Hérenguel, et al, published in France three related articles. The first two appeared in 1931 and 1932, and the third in 1936.

 The condenser described in the French patent differs from the one in the Hérenguel articles in that the condensing tube described in the former has a sleeve, carrying the fins, which fits over the inner tube containing the circulating water, or alternatively, in that the condensing tube may have — -in lieu of the sleeve — a plate at its end, as well as spaced fins behind this plate. These differences are not material for our purposes.

 This is not to say that the process claims are limited to the particular apparatus disclosed by the respective descriptions. Smith v. Snow, 294 U.S. 1, 11 (1935). However, the process claims are subject to the same rules of construction as govern the apparatus claim (Buckeye Incubator Co. v. Blum, 17 F. 2d 456, 458 (N.D. Ohio, 1927)) and unless limited to processes in which magnesium vapors are deflected away from the condenser, rather than condensing on it, while other vapors are allowed to pass on, are subject to the same potential defect (i.e., anticipation) that bars a broad construction of the apparatus claim.

 But not deciding that the claims, so read, are valid as patentable inventions.

 The accused plants and methods of operation at Canaan and Wingdale have been stipulated to be identical. They will be referred to as “Canaan-Wingdale.”

 In one form the two plates may be separated, and In the other the spacers are welded to both plates.