**Edward P. BARRETT, Executor of the Estate of Clifford C. Jones, Sr. v. The UNITED STATES.**

**No. 397–58.**

United States Court of Claims.

Decided Dec. 13, 1968.

Douglas W. Wyatt, New York City, for plaintiff. Arthur A. March, New York City, attorney of record and Russell G. Pelton, New York City, of counsel.

Edward Michael Flynn, Silver Spring, Md., with whom was Asst. Atty. Gen., Edwin L. Weisl, Jr., for defendant. Howard B. Rockman, Silver Spring, Md., of counsel.

Before COWEN, Chief Judge, DUR-FEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

## OPINION

### PER CURIAM:

This case was referred to Trial Commissioner James F. Davis with directions to make findings of fact and recommendation for conclusions of law under the order of reference and Rule 57(a). The commissioner has done so in an opinion and report filed on December 20, 1967. Exceptions to the commissioner's opinion, findings and recommended conclusion of law were filed by plaintiff and the case has been submitted to the court on oral argument of counsel and the briefs of the parties. Since the court agrees with the commissioner's opinion, findings and recommended conclusions of law, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case.* Therefore, plaintiff is not entitled to recover and the petition is dismissed.

### OPINION OF COMMISSIONER

### DAVIS, Commissioner:

This is a patent suit under 28 U.S.C. § 1498 to recover "reasonable and entire compensation" for the Government's allegedly unauthorized use of plaintiff's patented invention. Plaintiff is executor of the estate of Clifford C. Jones, the inventor. Jones owned the patent in suit at the time of his death in 1962. By stipulation of the parties, only claim 7 of the patent is asserted and only the

question of liability is now before the court.

The patent in suit is Jones Patent No. 2,078,854, entitled "Boundary Layer Air Control," issued in 1937. It expired in 1960.[1] It relates to control of airflow around aircraft surfaces to improve flight characteristics of the aircraft. The patent was earlier litigated in this court, Jones v. United States, 100 F.Supp. 628, 120 Ct.Cl. 747 (1951) (hereinafter *Jones I*), with respect to aircraft not here in issue. The court held claim 9 invalid and eight other claims, including claim 7, not infringed.[2]

In *Jones I*, the patentee alleged infringement by Government use of two types of propeller-driven aircraft and one jet-propelled aircraft, all of World War II vintage. In this case, the structures alleged to infringe are jet-propelled fighter and bomber aircraft used by the military services in the "cold war" era.

Defendant contends, as it did in *Jones I*, that claim 7 is invalid and not infringed. A principal argument is that defendant's accused structures and their operation follow the teachings of the prior art and therefore claim 7, if construed to be infringed, is invalid.

### BACKGROUND

To understand the issues, it is necessary to set out some fundamentals of aerodynamics.[3] An airplane is maintained in flight by its forward motion

---

* Because the argument should have been, but was not, presented to the trial commissioner, the court refuses to consider the new contention as to "boundary layer volume" made for the first time by new counsel after the filing of the trial commissioner's report. The case was tried on a wholly different basis.

1. Normally, the patent would have expired in 1954. However, it was extended by the Commissioner of Patents to July 27, 1960, pursuant to The Veterans Patent Extension Act of June 30, 1950, 64 Stat. 316.

2. The court made detailed findings of fact in *Jones I* with respect to the patent dis-

closure and the scope of claim 7 which are pertinent to this case. Such findings, in modified form, are restated in the findings of fact accompanying this opinion. Many of defendant's exhibits in *Jones I* and two volumes of the transcript were admitted into evidence in this case. The exhibits relate primarily to description of the patented invention, and the transcript contains the testimony of the patentee, Jones.

3. Findings 4–8 state such fundamentals in detail. The statement in this opinion is a brief summary.

through the air in such manner as to produce a lifting effect upon the wings. A wing is an airfoil having an upper and lower curved, or cambered, surface. In a typical wing, the upper surface has a greater curvature, or camber, than the lower surface, thereby causing air passing over the upper surface to move at a higher relative velocity than air passing over the lower surface. By well-known principles of fluid mechanics, the higher velocity air exerts decreased pressure on the upper wing surface, thereby creating on the wing a net upward force called lift.

The air which moves adjacent wing surfaces is called "boundary layer air." Toward the forward or leading edge of the wing, the boundary layer is microscopically thin and its movement over the wing surface is laminar.[4] However, toward the rear or trailing edge of the wing, boundary layer air decreases in velocity, increases in thickness (to several inches), becomes turbulent, and tends to separate from the wing surface. Such separation is detrimental to lift and it increases drag which, simply stated, is the resistance of the aircraft to forward motion.

The movement of boundary layer air over an airfoil creates pressure zones around its circumference whose magnitudes are a function of the velocity and flow characteristics of the air. In turn, the velocity and flow characteristics of the air depend on the contour of the airfoil, its angle of attack, and its speed. Fig. 2, reproduced with finding 5, shows a typical airfoil pressure diagram.

It was well known at the time the application for the patent in suit was filed, as evidenced by the prior art cited by defendant, that the lift-producing capabilities of a wing could be improved by altering the normal flow of boundary layer

air over the wing surface. One method was to draw or suck turbulent boundary layer air into the wing through openings in the wing, compress the air, and eject it out through a different opening. The net effect was to improve lift by removing undesirable turbulent air from one place on the wing surface and, after compression, to eject it into other turbulent zones to improve their flow characteristics.

PATENT IN SUIT

The Jones patent is directed to the method, above noted, of treating boundary layer air by drawing or sucking it into the wing through slots in the wing, compressing it, and discharging it out other slots. Jones' method, stated in the patent specification to be based on experimental wind tunnel tests, is bottomed on (1) his alleged discovery that the place at which boundary layer air should be removed from a wing surface, as well as the place to which it should be discharged after compression, depends on aircraft speed; and on (2) a new theory and definition of what constitutes boundary layer air.

*Removal of boundary layer*

Jones' method is illustrated diagrammatically in Figs. 1–4 of the patent, reproduced in finding 10. Each figure represents an airfoil moving at a different speed, viz., "very slow," "slow," "cruising," and "high."[5] Depending on the speed of the aircraft, air is drawn into the wing through slots at one location, then compressed and ejected through slots at another location. The patent specification and drawings disclose an intricate apparatus inside the wing for opening and closing the various slots in response to changing aircraft speed. A compressor, also inside the wing, operates in response to aircraft speed either to in-

4. I. e., the air moves as if it comprised a series of thin, stacked layers or laminations sliding over one another, analogous to the way playing cards slide over one another if the bottom card of the deck is held stationary and the other cards are moved parallel to it.

5. The patent specification does not define the speeds. However, in 1936 when the patent application was filed, high aircraft speed was about 150 miles per hour.

crease or decrease the extent to which the removed air is compressed. At higher speeds, compression is increased.

The patent has 21 claims, both to apparatus and method. Our attention in this suit is focused on claim 7 which defines patentee's method for the special case in which the aircraft is moving at "high" speed. In claim 7, set out below in outline form, clauses (f), (g), and (h) recite the three steps of the method:

(a) The method of modifying the absolute coefficients of lift and drag of an aerodynamic section while in motion, said section possessing

(b) in the vicinity of its leading edge a normal atmospheric pressure zone,

(c) above its upper cambered surface a subatmospheric pressure zone,

(d) below its lower cambered surface a superatmospheric pressure zone at a higher pressure than the subatmospheric pressure zone and

(e) adjacent its trailing edge a resultant atmospheric pressure zone created by the convergence of the airflows passing from the section and of a higher pressure than the normal pressure zone,

(f) the steps of removing the boundary layer volume of air substantially over the entire span of said section from and at a point adjacent the normal atmospheric pressure zone,

(g) compressing said boundary layer volume of air and

(h) discharging said volume at a point adjacent the resultant atmospheric pressure zone in rear of trailing edge of the said aerodynamical section.

Fig. 4 (fining 10) illustrates the method of claim 7. Fig. 4 is described in the patent specification thus:

Figure 4 is diagrammatic of the removal of boundary layer volume at

high speeds. When an airfoil or other aerodynamic section is passing through a fluid medium at high speeds, a tremendous profile pressure is created which builds up [at its leading edge *a*] * * *. Under such conditions, the boundary layer is *induced* from the leading edge portion *a* at a *speed greater than the normal air speed of the airfoil* and, after the mass has been increased in pressure and flow speed, it is discharged into the trailing edge zone *c*.

Under all of the conditions just explained, the rate of fluid flow of the induced boundary layer volume or mass is accelerated with regard to the pressure and speed of the mass to insure increased internal pressure and velocity at the moment of its discharge.

This is primary [*sic*] for the reason that in every instance the discharge not only dissipates the boundary layer volume which has been removed but the accelerated flow of the mass is discharged adjacent another sector of the airfoil to further remove boundary layer mass from adjacent that sector. [Emphasis added.]

It is clear from claim 7, read in light of Fig. 4 and the quotation from the specification explaining Fig. 4, that plaintiff's idea for improving flight characteristics of high-speed aircraft was to "induce" or suck air into the leading edge of the wings, compress it, and discharge the resulting high-pressure air out the trailing edge of the wings.[6] As this court noted in *Jones I*, at 797, 100 F. Supp. at 657, " * * * Even to one unskilled in aeronautical art, it is apparent that under the Jones theory the compressor in the wings and the entrance and discharge slots would all have to be of such a large capacity that the airplane would literally suck its way through the air. * * * " No device was ever built which practiced the Jones' invention.

---

6. It is necessary and proper to interpret claim 7 in light of the specification and drawings. See Dominion Magnesium Ltd. v. United States, 320 F.2d 388, 162 Ct.Cl. 240 (1963).

Plaintiff's expert testified that the control devices are "impractical."

Jones' invention, so plaintiff admits, is not concerned with aircraft power plants, although the method steps of claim 7 bear superficial resemblance to operation of an aircraft jet engine. In fact, several prior art patents, including Campini and Lysholm, discussed later, show it was old in 1936 to propel aircraft with jet engines. The induction of air into the wings in Jones' method, and its compression and discharge, was not for the purpose of propelling the airplane but was simply to modify the lift and drag characteristics of the aircraft.[7]

*Jones' "boundary layer volume"*

The Jones patent acknowledges the concept and definition of boundary layer air, above noted, generally accepted in the art at the time the patent application was filed. The specification states:

＊　　＊　　＊　　＊　　＊　　＊

To date, the subject of boundary layer has been best expressed as the radical difference between the behavior of an ideal fluid and that of a viscous fluid when flowing around a mass and,

while this identifies without a doubt that there exists on the surfaces of a body a volume of air known as boundary layer, it is more of a fictional definition of what boundary layer does rather than what it really is, and all efforts thus far have been toward controlling and removing boundary layer from the upper surface of an airfoil.

＊　　＊　　＊　　＊　　＊　　＊

Jones, however, introduces a new term and concept, "boundary layer volume," which he defines as the volume of air displaced by an airfoil. E. g., if an airfoil displaces 10 cubic feet, its boundary layer volume is 10 cubic feet of air. As the airfoil moves forward, it successively displaces its own volume for each chord length it advances, or to state it another way, it successively displaces its boundary layer volume. According to the patent, particularly claim 7, it is this boundary layer volume of air which in patentee's method is induced into the leading edge of the wing, compressed, and ejected out the trailing edge. It follows from Jones' concept that the faster the airplane flies, the greater is the total volume of air displaced by, and induced into, the wing per unit time.[8]

---

7. One of the objects of the invention is stated thus in the specification:

A still further object of the invention is to provide a method of control of the boundary layer volume or mass around the circumference of the airfoil so as to produce improved flow or trim, thereby creating force for large drag coefficients now characteristically produced through the use of conventional flaps and aileron control devices. In other words, it is practical to apply force at certain points on an airfoil camber which will slow up or accelerate the boundary layer volume flow, thereby producing a down-wash or an up-wash aerodyamic force coefficient, and *in thus so doing the elimination of all movable control units is possible.* [Emphasis added.]

Defendant's expert witness, Ira Abbott, testified:

＊　　＊　　＊　　＊　　＊

Q. Would you please explain what the patentee is disclosing to you in this portion of the patent specifications?

A. To me he is disclosing the rather startling claim that through the application of his patent it is practical to do away with all the control surfaces on an aircraft; that is, flaps, ailerons, the rudder, the elevator, and any others that might be used, and are sometimes used, substituting for those controls the boundary layer control described in this patent.

I say this is a startling claim and one which I can only describe as completely erroneous.

＊　　＊　　＊　　＊　　＊

8. A considerable part of the testimony contained in 2,748 pages of trial transcript is directed to the meaning and significance of Jones' "boundary layer volume." Plaintiff's expert, Richard K. Wentz, testified as follows:

＊　　＊　　＊　　＊　　＊

Q. I believe you stated that Mr. Jones' boundary layer volume exists in physical fact.

A. Yes.

Q. Can you prove that existent physical fact outside the patent in suit?

■ Jones' concept of boundary layer volume has no art-recognized status and has neither physical nor aerodynamic significance except to explain his invention. The boundary layer volume for a given wing is a considerably greater volume of air than that conventionally referred to as boundary layer air. However, the patentee is entitled to be his own lexicographer, so long as he makes his invention clear. Chicago Steel Foundry Co., v. Burnside Steel Foundry Co., 132 F.2d 812 (7th Cir. 1943). Here, Jones' definition of boundary layer volume is understandable and adequately defined to explain the invention.

### DEFENDANT'S ACCUSED AIRCRAFT

Plaintiff charges infringement by Navy and Air Force use of the following aircraft: A3D, B–36, B–47E, F–84, F–86, F–89, F–100, XB–51, and XB–52.[9] For purposes of this case, the aircraft can be considered of two types: (1) those having an open-ended fuselage in which a jet engine is mounted (hereinafter "open-fuselage type" aircraft), and (2) those having open-ended pods or nacelles [10] mounted under the wings or alongside the fuselage which house jet engines (hereinafter "nacelle type" aircraft). The F–100, F–86, and F–84 are open-fuselage type. The A3D, B–36, B–47E, F–89, XB–51, and XB–52 are the nacelle type.

The F–100 is representative of the open-fuselage type aircraft. Its fuselage, hollow and generally cylindrical, houses a jet engine and supports the wings and tail structure. The jet engine, mounted with its axis parallel to the fuselage axis, comprises a series of air compressors, a combustion chamber, and a gas turbine mounted on a common shaft with the compressor. In operation, air enters the engine through the open front end of the fuselage, is compressed and fed into the combustion chamber, then burned with fuel. Hot combustion gases expand rearwardly out the fuselage to drive the turbine and create thrust to propel the aircraft forward.

A. Having defined boundary layer volume as in the patent, yes, it can be proved that such a volume exists.

\*     \*     \*     \*     \*

Q. Can you prove it as a physical fact?

A. Yes; I suppose if you had a tank filled with flour that you make bread out of, which is a fluid, and immersed in that a wing section or a body of revolution, you could physically show that a boundary layer volume was displaced.

\*     \*     \*     \*     \*

Q. Is it your testimony, then that this would prove as a physical fact Mr. Jones' boundary layer volume?

A. This would prove that it actually exists even though you can't see it in air.

Q. Would it prove it to a person skilled in the art?

A. I would think it would prove it to anyone.

\*     \*     \*     \*     \*

This definition is in apparent conflict with other testimony of Wentz in which he said that boundary layer volume depends not only on airfoil static displacement volume but also on the speed at which the airfoil is moving, i.e., for a given airfoil, its boundary layer volume when moving, say at 200 miles per hour, is twice what it is moving at 100 miles per hour.

The first definition is consistent with the patent specification and with the patentee's testimony in *Jones I*. The second definition is just another way of saying that the total volume of air displaced by a moving airfoil per unit time depends on both its static displacement volume and its speed. The concepts are not inconsistent and it makes no difference to resolving the issues here which one is used.

9. Several modifications of the F–84, F–86, and F–89 are charged to infringe. To resolve the issues here, the differences among the various models are immaterial.

Defendant contends that the XB–51 and XB–52 were used during the recovery period only as "experimental" aircraft and are not subject to royalty. Since neither aircraft is held to infringe, this issue is moot.

10. A nacelle is an enclosed shelter on an aircraft for housing the power plant, e.g., a jet engine. The nacelles here involved are generally cigar-shaped and are shorter than the fuselage.

When the aircraft is at rest, the engine is started by turning the compressor with an electric motor. This induces airflow into the front of the fuselage by virtue of rotation of the compressor. Under normal cruising flight conditions, however, air is forced or rammed into the front of the fuselage by forward motion of the aircraft rather than by rotation of the compressor. The air so entering the fuselage and engine is called "ram air." Air pressure at the inlet to the compressor is substantially the impact pressure of the air on the front of the forwardly moving aircraft.

The velocity of air entering the engine at normal cruising flight conditions is less than the forward velocity of the aircraft. If it were otherwise, i. e., if the velocity of entering air was greater than the forward velocity of the aircraft, the engine would in effect be "sucking" its way through the air. This is contrary to principles of design and operation of jet engines.

The volume of air consumed by the engine depends on the speed of the engine and the speed of the aircraft. The volume consumed per unit time is substantially less than the volume displaced by the fuselage per unit time as the aircraft moves forward.[11]

The primary purpose of the F–100 fuselage is to house personnel and equipment, including the jet engine, and to support the wings and tail structure. It is streamlined for minimum air resistance to forward movement of the aircraft and for minimum interference with lift of the wings. The fuselage is not designed as, nor does it function as, a lift-producing element of the aircraft. However, at certain attitudes of flight, upward forces are created on the fuselage by airflow thereover in accordance with principles of flight summarized above; and to some extent, such upward forces contribute to lift.

The A3D is representative of nacelle type aircraft. It has two nacelles, each housing one jet engine, one mounted to each wing by pylons which are narrow support struts streamlined for minimum resistance to airflow. The operation of the jet engines in the nacelles of the A3D and the other nacelle type aircraft is in all material respects similar to the operation above described with respect to the F–100.[12]

Necelles, like fuselages, are not designed as lift-producing elements of an aircraft. Rather, they are designed to support and house jet engines. However, at certain attitudes of flight, upward forces are created on nacelles, like on fuselages, which contribute to lift.[13]

### INFRINGEMENT

Plaintiff contends that operation of defendant's accused aircraft at normal cruising flight conditions infringes claim 7. Essentially, plaintiff's position is that the fuselages and nacelles of the respective aircraft are "aerodynamic sections"; that the "coefficients of * * * lift and drag" are modified by operation at normal flight conditions of their respective jet engines; that "boundary layer volume" of air is removed across the "entire span" of the fuselages or nacelles by the jet engines; and that such "boundary layer volume" of air is compressed

11. The F–100 engine, at normal cruising conditions, consumes about 1,600 cubic feet of air (sea-level conditions) per second. Assuming a cruising speed of 400 miles per hour (about 588 feet per second) and assuming the F–100 fuselage is equal in volume to a cylinder 47 feet long and 6 feet in diameter (about 1,330 cubic feet), the volume of air displaced per second by the fuselage is about 16,600 cubic feet, which is more than 10 times what the engine consumes.

12. Each A3D nacelle is approximately equivalent in volume to a cylinder 16.3 feet long and 4.2 feet in diameter (225 cubic feet). Assuming the same flight conditions as in fn. 11, the volume of air displaced per second by the nacelle is about 8,100 cubic feet, more than 5 times what the engine consumes.

13. Sometimes nacelles are designed to produce "negative lift," i.e., a net downward force, to oppose lift of the wings and trim the aircraft in flight.

and discharged at the "trailing edge" of the fuselage or nacelle.

As earlier noted, plaintiff does not contend that Jones invented jet propulsion. Nevertheless he contends that defendant's accused 'devices appropriate the substance of Jones' invention because the fuselages and nacelles in question are designed so that when moving at normal cruising flight conditions with the jet engines operating, their lift and drag characteristics are modified.

■■ Long ago, the Supreme Court in Machine Co. v. Murphy, 97 U.S. 120, 125, 24 L.Ed. 935 (1877), said with respect to determining patent infringement:

> * * * the court * * * [is] not to judge about similarities or differences by the names of things, but * * * [is] to look at the machines or their several devices or elements in the light of what they do, or what office or function they perform, and how they perform it, and to find that one thing is substantially the same as another, if it performs substantially the same function in substantially the same way to obtain the same result, always bearing in mind that devices in a patented machine are different in the sense of the patent law when they perform different functions or in a different way, or produce a substantially different result.

This court recently stated in Autogiro Co. of America v. United States, 384 F.2d 391, 401, 181 Ct.Cl. 55, 68 (1967), rehearing denied, 184 Ct.Cl. 801 (1968):

> * * * the determination of patent infringement is a two-step process. First, the meaning of the claims in issue must be determined by a study of all relevant patent documents. Secondly, the claims must be read on the accused structures. In doing this, it is of little value that they read literally on the structures. What is crucial is

that the structures must do the same work, in substantially the same way, and accomplish substantially the same result to constitute infringement. * *

See also Westinghouse v. Boyden Power Brake Co., 170 U.S. 537, 18 S.Ct. 707, 42 L.Ed. 1136 (1898).

There is considerable conflicting testimony about the meaning of terms in claim 7 and their application to the operation of defendant's accused aircraft. Defendant contends, for example, that "aerodynamic section" means airfoils or wings, not fuselages and nacelles, and that terms such as "leading edge," "trailing edge," "lift and drag," and "span" apply only to airfoils. Also defendant contends that the various pressure zones named in claim 7 have no corresponding elements in the operation of its accused aircraft.

■ It is unnecessary to resolve the conflicts of terminology since plaintiff cannot prevail in any event.[14] Plaintiff's case for infringement fails for a more fundamental reason, viz., that defendant's aircraft do not "do the same work, in substantially the same way, and accomplish substantially the same result" as the patented invention. *Machine Co.* and *Autogiro* cases, supra. The purpose of the steps of "removing," "compressing," and "discharging" air in the patented method is to modify lift and drag coefficients. Defendant's aircraft, on the other hand, "remove," "compress," and "discharge" air to operate jet engines. Any modification of lift and drag coefficients on the fuselages and nacelles is incidental. There is no real identity of purpose between the patented invention and operation of defendant's aircraft. Further, the air consumed by the jet engines at normal cruising flight conditions is ram air whose volume bears no meaningful relationship to Jones' "boundary layer volume." The evidence is clear that the volume of air consumed per unit time is considerably less than

---

14. Certain of the conflicts are resolved in the findings of fact in this case and in *Jones I.* Their resolution, however, is not crucial to the result reached, and there is no need to go into detail in this opinion.

the boundary layer volume displaced by the fuselages or nacelles per unit time. (See fns. 11 and 12.) Otherwise, the jet engines would be "sucking" their way through the air, a phenomenon apparently envisioned by Jones but having no applicability to jet engine operation.

■ Another defense argued by defendant is that its aircraft operate like those of the prior art; and therefore, if claim 7 is construed to be infringed, it is invalid. Defendant relies particularly on two prior art patents, Campini and Lysholm (findings 27 and 28), which teach that it was old at the time Jones filed his patent application to house jet engines in open-ended fuselage type aircraft or in nacelles mounted on wings of an aircraft.[15] Defendant asserts its aircraft operate in all material respects like those of Campini and Lysholm, and relies on Scott Paper Co. v. Marcalus Mfg. Co., 326 U.S. 249, 66 S.Ct. 101, 90 L.Ed. 47 (1945), for the proposition that it is free to use structures and methods disclosed in expired patents.

■ Plaintiff concedes that the Campini and Lysholm aircraft are similar in structure and operation to defendant's. However, plaintiff distinguishes the prior art aircraft on grounds that they do not operate such that there is modification of lift and drag coefficients with respect to their fuselages and nacelles. Plaintiff's argument falls of its own weight. While Campini and Lysholm do not expressly disclose such modification, the aircraft and their mode of operation are in all material respects identical to defendant's aircraft. To whatever extent lift and drag coefficients are modified in defendant's aircraft when operated at normal cruising flight condi-

tions, they are similarly modified in Campini and Lysholm.

Therefore, as plaintiff construes claim 7, Campini and Lysholm would infringe; and since Campini and Lysholm are prior art, claim 7 would be invalid.[16] American Fruit Growers, Inc. v. Brogdex Co., 283 U.S. 1, 51 S.Ct. 328, 75 L.Ed. 801 (1931); International-Stacey Corp. v. United States, 42 F.Supp. 384, 95 Ct.Cl. 357 (1942).

### VALIDITY

■ Defendant challenges the validity of the Jones patent, citing 41 prior art references. Since there is no infringement, it is unnecessary to decide validity. Although the Supreme Court said in Sinclair & Carroll Co. v. Interchemical Corp., 325 U.S. 327, 65 S.Ct. 1143, 89 L. Ed. 1644 (1945), that in patent-infringement litigation the issue of validity is of greater public importance than infringement and should be fully inquired into, there is no sound reason to do so in this case. The patent has expired. There is no evidence of outstanding licenses which might be affected by a ruling on validity. There is no evidence that the patent is being litigated in any other court, and new suits are barred by 35 U.S.C. § 286. See Autogiro Co. of America v. United States, supra, 384 F.2d, at 415, 181 Ct. Cl., at 91–92.

### FINDINGS OF FACT

1. (a) This is a patent suit under Title 28 U.S.C. § 498. Plaintiff seeks reasonable and entire compensation for unauthorized use by defendant, the United States, of the invention described and claimed in U. S. Patent 2,078,854, entitled "Boundary Layer Air Control," issued to Clifford C. Jones, on April 27,

---

15. The Lysholm patent issued after, but was filed before, the patent in suit. Lysholm is therefore in the prior art. Hazeltine Research, Inc. v. Brenner, 382 U.S. 252, 86 S.Ct. 335, 15 L.Ed.2d 304 (1965).

16. In *Jones I*, this court reached the same conclusion with respect to the P–80 jet-

propelled aircraft there in issue. The P–80 is similar in many respects to aircraft in this suit. This court said (finding 52): " * * * If the phraseology of any of the claims in suit [including claim 7] were applicable to the P–80 airplane such phraseology would be more readily applicable to the Campini structure and would be invalid."

1937, on an application filed June 20, 1936.

(b) The petition was filed August 28, 1958, by Clifford C. Jones, pro se. Jones died in 1962. Plaintiff, the executor of Jones' estate, is owner of all right, title and interest in the Jones patent. At the time of his death, Jones was a U. S. citizen and the sole owner of the patent in suit.

2. Counsel for the parties before trial stipulated as follows:

(a) The issues of validity and infringement are limited to claim 7;

(b) The issue of accounting, if any, is deferred until resolution of the issues of infringement and validity; and

(c) The accounting period for which reasonable and entire compensation, if any, is to be paid is from January 6, 1951 to April 27, 1954, with respect to alleged use of the patented invention by the Air Force; and from April 17, 1952 to April 27, 1954, with respect to alleged use by the Navy.

3. (a) Claims 1, 3, 7, 9, 10, 11, 15, 16, and 18 of the patent in suit were previously litigated in this court with respect to three types of government-procured aircraft not here in issue. This court's decision and opinion, reported as Jones v. The United States, 100 F.Supp. 628, 120 Ct.Cl. 747 (hereinafter *Jones I*), was handed down October 2, 1951. This court held that claim 9 of the patent was invalid and that none of the other claims in issue were infringed by any of the three government structures there in issue, two of which were propeller-driven airplanes and one a jet-propelled airplane. Plaintiff thereafter on October 17, 1951, filed a statutory disclaimer of claim 9.

(b) Certain findings of fact made in *Jones I* with respect to the disclosure of the patent in suit and the scope of claim 7, the only claim here in issue, are pertinent to this case and are noted below. Many of defendant's exhibits in *Jones I*, and two volumes of the transcript therein, were admitted into evidence in this case. The exhibits relate primarily to description of the patented invention in suit and the transcripts contain the testimony of the patentee, Clifford C. Jones.

## PRINCIPLES OF FLIGHT [1]

4. An airplane is maintained in flight by its forward motion through the air in such manner as to produce a lifting effect upon the wings. At the time the application for the patent in suit was filed (1936), several more or less standardized wing forms, or airfoils, had been developed. In general, such wings have a blunt leading edge, followed by a relatively thick midsection which tapers to a narrow or sharp rear or trailing edge. A representative airfoil used in early aircraft is the "Clark Y airfoil."

Fig. 1, reproduced herewith, illustrates streamlined airflow around a Clark Y

*Fig. 1.*

1. Findings 4 through 14 herein are similar to findings 2 through 11 in *Jones I*. Changes reflect the fact that in this case attention is focused on different accused aircraft and on a single claim (claim 7). Accordingly, the recitation of facts requires different emphasis.

The facts and the prior art are set out in somewhat greater detail than necessary to resolve the issues here. However, because of the technical nature of the subject matter and because the patent specification in suit is in many respects unclear, the detail is necessary.

airfoil[2] as it moves from right to left through the air. The blunt leading edge displaces the air as shown, some passing over the wing, some under. The air passing over the wing follows a curved streamlined path along the wing's upper camber; and, since it must traverse a longer path than the air moving across the bottom of the wing, its velocity with respect to the wing increases. According to Bernoulli's principle,[3] such increase in the velocity results in a decrease in pressure along the upper wing surface.

On the other hand, on the under surface of the wing, the air is forced down and slightly compressed as the airfoil moves forward and its pressure increases. Assuming the wing is moving through air at a pressure of 14.7 pounds per square inch, which is standard sea-level pressure, the pressure below the wing will therefore be greater than, and above the wing less than, 14.7 pounds per square inch. This difference produces "lift."

5. Fig. 2, reproduced herewith, illus-

Fig. 2.

trates the pressures exerted on a Clark Y airfoil in level flight, the relative length and direction of the arrows indicating the magnitude of air pressure around the airfoil circumference. Fig. 2 also illustrates the relatively high pressure created by the impact of the air striking against the front edge of the wing as it moves forward.

In Figs. 1 and 2, above described, the fore and aft axis of the wing is at zero angle of attack. If the leading edge of the wing is tilted upwardly so that the angle of attack increases to, e. g., four or five degrees, the streamline pattern shown in Fig. 1 and the pressure pattern in Fig. 2 will change. The air will be further compressed underneath the wing,

and the streamlines of the upper surface will be more sharply deflected upwardly. This will increase the upward forces on the wing on both its upper and lower surfaces. However, more force or thrust will then be required to move the wing forward at the same speed. Resistance to this forward movement, including the frictional effects present in the boundary layer (finding 6), is called drag. It is the power of the engines applied either through propellers or jet thrust that overcomes drag. In short, lift is the force which acts upwardly on the wing to sustain flight; drag is the force acting rearwardly of the airplane resisting forward movement; and thrust is the force

2. Actually, air does not "flow" around an airfoil. The air merely gives way as the airfoil passes through. However, for purposes of engineering analysis, the wing may be considered at rest, with the air flowing around it.

3. Bernoulli's principle is that when the velocity of a fluid moving along a surface is increased, the pressure exerted by the fluid against the surface over which it is passing is decreased.

of the engines acting forwardly to overcome drag.

For a given set of conditions, a wing of larger area will give more lift but its drag will be increased. The efficiency of an airplane wing is expressed aerodynamically as the lift-drag ratio, and the objective sought by aeronautical engineers is a ratio of maximum lift to minimum drag. This means minimum engine power relative to the speed and load-carrying capacity of an airplane.

The Clark Y airfoil, above described, is not used in modern aircraft because the lift created thereby is too great for speeds normally flown. However, the principles of flight described with reference thereto apply to all airfoils as well as other streamlined bodies over which air flows. In modern high-speed aircraft, the wings comprise in large part symmetrical airfoils, i. e., airfoils whose upper and lower cambers are the same. The pressure distribution about a symmetrical airfoil, moving at zero angle of attack, differs from Fig. 2 in that the upward force created by flow of air over the top of the airfoil is balanced by downward force created by air flowing over the bottom. Therefore, lift is produced by such an airfoil only when it is flown at an angle of attack greater than zero.

### Boundary Layer

6. Fluids, including liquids and gases, resist flow because the molecules comprising the fluid attract one another. Work is therefore required to cause the molecules to move. The fluid friction which results from such movement is called "viscosity." Liquids are more viscous than gases because the molecules are closer together and attract each other more. When a liquid or gas is in contact with a solid surface, the molecules closest to the surface tend to stick to the surface as a film or layer, even when the liquid or gas is moved along such surface.

As an example, the effects of fluid viscosity and adherence of a fluid to a solid surface can be seen on a ship's hull as it moves through water. The layer or film of water in immediate contact with the hull of the ship travels at the speed of the ship. The water outward of such layer or film can be thought of as a series of succeeding layers which move along next to each other by friction. Each succeeding outward layer or film has less forward motion imparted to it by motion of the inner layers until an outer layer is reached which is not influenced by the forward motion of the ship.

This same viscosity or frictional effect results when there is relative movement between an airplane outer surface and air in contact therewith. As the airplane moves through the air, a microscopically thin layer of air immediately adjacent the surface moves with it at the same speed. If the air is thought of as being made up of a series of very thin laminar layers, each layer has some motion imparted to it by friction from the preceding layer until an outer layer is reached in which this viscosity or frictional effect disappears.

Fig. 3, reproduced herewith, illustrates

Fig. 3.

in greater detail the effect just mentioned. The airflow is shown as moving from left to right across the surface of a stationary flat plate. At the surface of the plate (left end), the air is stationary with respect to the plate. Above such surface, at the top of the airstream shown in Fig. 3, left end, the air is moving with full-stream velocity. In between these limits, the layers or laminae of air are shearing over each other in much the same manner that sheets of paper would slide over each other if the bottom of a stack of paper were held stationary and the other sheets moved parallel with the surface of the paper. This portion of the airflow is called "laminar flow."

At a certain point (called "transition point") along the plate surface, depending upon numerous variables, laminar flow ceases and the airflow along the plate surface becomes turbulent. Turbulent flow is characterized by random movement of the air molecules and eddy currents. Because molecular movement is random, viscosity or fluid friction increases, or to state it another way, resistance to flow increases.

Fig. 3 is not drawn to scale, and the thickness of the laminar and turbulent layers is greatly enlarged for purposes of illustration. In reality, laminar airflow on an airplane wing, for example, varies only from a few thousandths to a few hundredths of an inch in thickness, and the turbulent portion is only a few inches thick. The region of airflow which includes both the laminar and turbulent portions is known to those skilled in the art as the "boundary layer."

7. Instruments exist for measuring the thickness and other characteristics of boundary layer air on an airplane wing, and there have been derived various mathematical expressions for calculating such thickness and other characteristics.

Illustrative of airflow around a typical airfoil, Fig. 4, reproduced herewith,

shows (as well as can be shown on a small drawing) the boundary air layer existing around the wing of a B–17 airplane, flying at a speed of 250 miles per hour, at 20,000 feet, and at an angle of attack of about 4.5 degrees. The chord (distance from leading edge to trailing edge) of the B–17 wing section shown in Fig. 4 is about 13.5 feet.

Laminar flow on both the upper and lower wing surfaces exists back to the points marked "transition." It varies from a few thousandths of an inch to a few hundredths of an inch in thickness and therefore cannot be shown to scale on the drawing. The transition point on the upper wing surface is about 9 inches aft of the leading edge, and on the lower wing surface about 48 inches aft of the leading edge. From the transition points to the trailing edge of the wing, the turbulent boundary layers increase from a fraction of an inch to about 6 inches on the upper surface and 2.5 inches on the lower surface.

The extent and thickness of the laminar and turbulent zones vary with an

airplane's altitude, speed, angle of attack, and character of wing surface.

## SEPARATION

8. As air flows over a wing or airfoil in motion, its velocity decreases as it proceeds rearwardly from the laminar zone to the turbulent zone. Such decrease in velocity causes an increase in pressure (Bernoulli's principle) toward the rear of the wing. Under certain flight conditions, and particularly at high angles of attack, this pressure increase is aggravated and causes the turbulent air to separate from the airfoil surface. Such separation distorts the streamline airflow over the wing and causes a reduction in lift, thereby adversely affecting the lift-drag ratio.

One of the primary objects of aerodynamics research is to minimize such turbulence and the separation caused thereby. In modern high-speed aircraft, this is ordinarily done by varying the contour of wing or other aircraft surfaces. However, in older aircraft, it was also done by treating the boundary layer air in one of two ways: Removing it from the surface by drawing or sucking it into the wing or fuselage through an opening in the wing or fuselage; or blowing it, usually along the wing or fuselage surface, with high-velocity air ejected through slots in the wing or fuselage in the direction of flow of the boundary layer air, thus increasing its velocity and reducing its pressure. Boundary layer control by removal or blowing of air is not desirable in modern high-speed and high-power aircraft since the energy required to operate compressors and related equipment exceeds the benefits gained.

## THE PATENT IN SUIT

9. The Jones patent in suit is directed to minimizing the effects of turbulence and separation by removing boundary layer air from aircraft surfaces. Claim 7, the only claim in issue, relates particularly to such removal when the aircraft is moving at "high speeds." The aircraft surfaces are stated in the patent specification to be surfaces of "aerodynamic sections." The term "aerodynamic section" is not defined in the patent. However, as guidance for the meaning of such term, the patent specification states that an object of the invention deals with modification of "any airfoil, airplane fuselage or airplane surface sectional structures * * * to uniformly increase their aerodynamic values * * *" and, further, that "all airfoils, aerodynamic sectional surfaces, transverse sections and the like accumulate around their circumferences a stratum of air commonly known as boundary layer." The only embodiments of the invention described in the patent deal with airplane wings which are airfoils.

The claims in the patent relate both to a method and apparatus for accomplishing the method. Claim 7 is to method. Broadly speaking, the method, as applied to airplane wings or airfoils, consists of (1) removing quantities of air near the airfoil or wing surfaces through slots in the surface of the airfoils or wings, (2) compressing this air by means of a blower or compressor mounted within the airfoil or wing, and (3) discharging the compressed air through different slots. The patentee discloses an intricate apparatus inside the wing of airfoil whereby the various slots can be opened or closed in response to changing aircraft speed. The air blower or compressor mounted inside the wing operates in response to aircraft speed either to increase or decrease the extent to which the removed air is compressed.

10. (a) The patentee's method of controlling boundary layer air is based on his findings, allegedly from wind tunnel tests, which show changing pressure and airflow characteristics around an airfoil at different aircraft speeds. According to the patentee's theory, since the location of turbulent zones changes with air-

craft speed, it is necessary to remove boundary layer air at varying locations around the wing.

(b) The method of the invention is illustrated diagramatically in Figs. 1–4, reproduced herein. Fig. 1 shows an air-

*Fig. 1.*

Very Slow Speed

*Fig. 2.*

Slow Speed

*Fig. 3.*

Cruising Speed

*Fig. 4.*

High Speed

PATENT IN SUIT

foil operating at what the patentee calls (but does not define) "very slow speed." In 1936 when the Jones patent application was filed, high speed was 150 miles per hour. Therefore "very slow speed" would presumably be significantly less. In Fig. 1, air is drawn into the airfoil through slots $a$ and $c$ at, respectively, the lower rear and trailing edge of the airfoil, and is then compressed (by means not illustrated in any of Figs. 1–4) and ejected through slot $b$ in the midportion of the upper surface of the wing. In Fig. 2, in which the airfoil is illustrated moving at "slow speed," boundary air is drawn in from the upper surface of the

wing at its midpoint through slot *b*, and is compressed and ejected from the lower surface and trailing edge through slots *a* and *c*, respectively. In Fig. 3, in which the airfoil is illustrated moving at "cruising speed," boundary air is drawn in through slot *b* in the upper surface of the wing, then compressed and ejected at the trailing edge through slot *c*.

(c) In Fig. 4, which illustrates the method of claim 7, the only claim here in suit, air is admitted at the nose or leading edge of the airfoil moving at "high speed" and, after compression, is ejected out slot *c* at the trailing edge.

11. With respect to Fig. 4, the patent specification states [emphasis added]:

Figure 4 is diagrammatic of the removal of boundary layer volume at high speeds. When an airfoil or other aerodynamic section is passing through a fluid medium at high speeds, a tremendous profile pressure is created which builds up [at its leading edge *a*] * * *. Under such conditions, the boundary layer is *induced* from the leading edge portion *a* at a *speed greater than the normal air speed of the airfoil*, and, after the mass has been increased in pressure and flow speed, it is discharged into the trailing edge zone *c*.

Under all of the conditions just explained, the rate of fluid flow of the induced boundary layer volume or mass is accelerated with regard to the pressure and speed of the mass to insure increased internal pressure and velocity at the moment of its discharge.

This is a primary [*sic*] for the reason that in every instance the discharge not only dissipates the boundary layer volume which has been removed but the accelerated flow of the mass is discharged adjacent another sector of the airfoil to further remove boundary layer mass from adjacent that sector.

The means used to "induce" the boundary layer air into the airfoil is a blower or compressor noted in findings 9 and 12.

12. The patent discloses a complex arrangement of mechanical linkages by which (1) the various slots in the wing (described in finding 10) can be opened or closed in response to the speed of the aircraft, and (2) the speed of the air compressor inside the wing is changed in response to changes in aircraft speed. A detailed description of such devices is not necessary here. Basically, the linkages are controlled by wind vanes which extend below the wing and which move backwards against spring bias as the aircraft speed increases. Such movement causes displacement of the linkages so that (1) the slots in the wings are opened and closed to produce the boundary airflow patterns shown in Figs. 1–4, and (2) the speed of the air compressor increases with aircraft speed.

13. (a) The patentee recognizes the definition of boundary layer air known to those skilled in the art as a layer of air adjacent the airfoil surface in which viscosity and frictional effects are present. (Finding 6.) The patent specification states:

To date, the subject of boundary layer has been best expressed as the radical difference between the behavior of an ideal fluid and that of a viscous fluid when flowing around a mass and, while this identifies without a doubt that there exists on the surfaces of a body a volume of air known as boundary layer, it is more of a fictional definition of what boundary layer does rather than what it really is, and all efforts thus far have been toward controlling and removing boundary layer from the upper surface of an airfoil.

(b) The patentee, however, in explaining the operation of the structures and method disclosed in his patent, uses a different concept of boundary layer air. The patentee's concept, which is supported by expert testimony in this suit and by the inventor's testimony in *Jones I*, is that boundary layer air for a given airfoil or aerodynamic section is a specific volume of air, which volume is equal to that displaced by the airfoil or aerodynamic section. The patentee calls this

"boundary layer volume." E. g., if an airfoil at rest displaces 10 cubic feet of air, then the boundary layer volume for that airfoil is 10 cubic feet of air. According to the patentee as the airfoil or aerodynamic section moves through the air, it successively displaces a quantity of air equal to the boundary layer volume for each chord length it advances. Thus, the faster the airplane flies, the greater the total volume of air displaced per unit time.

(c) The Jones' concept of boundary layer volume has no art-recognized status and has neither physical nor aerodynamic significance except to explain the patentee's invention. Such concept involves a considerably greater volume of air than that conventionally referred to as boundary layer air. However, as the patentee has defined "boundary layer volume," it is understandable to those skilled in the art.

14. The patentee's concept of airflow and pressure characteristics around an airfoil, as shown in Fig. 8 of the patent, differs from the conventional concepts shown in Figs. 1 and 2. (Findings 4 and 5.) However, in respects here material, both concepts are similar and are based on the existence of certain pressure zones around an airfoil. Specifically there is an impact sector at the leading edge of the airfoil, a zone of subatmospheric pressure existing above the airfoil, a zone of superatmospheric pressure existing below the airfoil, and a zone of air at the rear of the airfoil called by the patentee "resultant drag field."

### CLAIM 7

15. Claim 7, the sole claim in issue, is set out below, with lettered paragraphs in outline form:

(a) The method of modifying the absolute coefficients of lift and drag of an aerodynamic section while in motion, said section possessing

(b) in the vicinity of its leading edge a normal atmospheric pressure zone,

(c) above its upper cambered surface a subatmospheric pressure zone,

(d) below its lower cambered surface a superatmospheric pressure zone at a higher pressure than the subatmospheric pressure zone and

(e) adjacent its trailing edge a resultant atmospheric pressure zone created by the convergence of the airflows passing from the section and of a higher pressure than the normal pressure zone,

(f) the steps of removing the boundary layer volume of air substantially over the entire span of said section from and at a point adjacent the normal atmospheric pressure zone,

(g) compressing said boundary layer volume of air and

(h) discharging said volume at a point adjacent the resultant atmospheric pressure zone in rear of trailing edge of the said aerodynamical section.

16. The terms "normal atmospheric pressure zone," "normal pressure zone," and "resultant atmospheric pressure zone" in claim 7 are not defined in the patent specification. However, giving due regard to the specification as a whole, the Patent Office file history of the patent, and expert testimony in this court, the terms "normal atmospheric pressure zone" and "normal pressure zone" refer to the area marked 1 in patent Fig. 8, and the term "resultant atmospheric pressure zone" refers to the area marked 5 in patent Fig. 8.

In *Jones I* this court held that the term "boundary layer volume," as used in claim 7, is limited as defined in the Jones patent. (See finding 13.) Otherwise claim 7 would be invalid in view of prior art patents. Further, this court held in *Jones I* that the patentee uses the phrase "aerodynamic section" as referring to airfoil section. The court did not hold, however, that the phrase "aerodynamic section" is limited to an airfoil section. Giving due regard to the specification as a whole, the Patent Office file history of the patent, and expert testimony in this court, the term "aerodynamic section" is not limited to airfoils

or wings but includes fuselages and aircraft nacelles. (See finding 9.)

17. There is no evidence of conception or reduction to practice of the invention set forth in claim 7 prior to June 20, 1936, the filing date of the patent in suit.

There is also no evidence of the issuance of any license or the construction by plaintiff, other than models, of an airplane embodying the disclosure of the patent in suit.

### The Alleged Infringing Structures

18. The charge of infringement in this case is predicated on the use by the Navy and Air Force of the following aircraft: A3D; B–36; B–47E; F–84, models E, F, and G; F–86, models D, E, F, G, and H; F–89, models A, B, C, D, and H; F–100; XB–51; and XB–52. For purposes of resolving the issues, the differences between the various models of an aircraft are immaterial and the aircraft can be considered of two types: (1) those having an open-ended fuselage in which a jet engine is mounted (hereinafter "open-fuselage type" aircraft), and (2) those having open-ended pods or nacelles, mounted under the wings or alongside the fuselage, which house jet engines (hereinafter "nacelle type" aircraft).[4]

The F–100, F–86, and F–84 are the open-fuselage type. The A3D, B–36, B–47E, F–89, XB–51, and XB–52 are the nacelle type. In the open-fuselage type aircraft, plaintiff alleges that the method defined by Claim 7 is practiced when the fuselage, as an integral part of the aircraft, moves at normal cruising flight conditions. In the nacelle type aircraft, plaintiff alleges that the method defined by Claim 7 is practiced when the nacelles mounted on the aircraft, as an integral part thereof, move at normal cruising flight conditions.

*Open-fuselage type aircraft*

19. The F–100 is representative of open-fuselage type aircraft involved in this suit. The other open-fuselage type aircraft, while differing in many respects from the F–100 and among themselves, are substantially similar insofar as the infringement issue here is concerned. Therefore, the following description of the F–100 and its operating characteristics applies equally to the other open-fuselage type aircraft.

The F–100 comprises basically a hollow, generally cylindrical fuselage, open at both ends. A jet engine is mounted inside the fuselage with its axis parallel to the axis of the fuselage. The wings and tail structure are secured to the exterior of the fuselage.

The jet engine is a Pratt and Whitney J–57. It is an axial-flow type comprised of (1) a series of air compressors located toward the forward end of the fuselage, (2) a combustion chamber aft of the compressors, and (3) a gas turbine aft of the combustion chamber and mounted on a common shaft with the compressor.

In operation, air enters the engine through the front open end of the fuselage and is compressed to about 5 to 10 times its entering pressure through a series of compression stages in the engine. It is then fed into the combustion chamber at essentially no loss in pressure wherein fuel is injected, ignited, and burned. The hot combustion gases there produced expand rearwardly through the turbine, which drives the compressor, and out the rear end of the engine and the fuselage through nozzles, creating thrust which drives the aircraft forward. Gas pressure after expansion through the turbine and nozzles is essentially ambient.

When the aircraft is at rest, the jet engine is started by turning the compressor with an electric motor. This induces the flow of air into the front of the fuselage by virtue of rotation of the compressor which creates a pressure drop at the forward end of the compressor. When the airplane is in flight at normal

---

4. A nacelle is an enclosed shelter on an aircraft for housing the power plant, e. g., a jet engine. It is unusually shorter than a fuselage and does not carry the tail unit.

cruising conditions, however, air is forced or rammed into the front of the fuselage by the forward motion of the aircraft rather than by rotation of the compressor. The air so entering the engine is called "ram air." The engine and its fuselage housing are designed so that during normal flight conditions, the air pressure at the inlet to the compressor is as close as possible to the impact pressure of the air on the front of the aircraft as it moves forward. A jet engine operates most efficiently under such conditions. At a cruising speed of 400 miles per hour, the impact pressure is about 20 percent above ambient pressure.

The velocity of air entering the engine at normal cruising flight conditions is less than the forward velocity of the aircraft. If it were otherwise, i e., if the velocity of entering air was greater than the forward velocity of the aircraft, the jet engine would in effect be "sucking" its way through the air.

The quantity of air used by the jet engine depends on the speed of the engine and the speed of the aircraft. The Pratt and Whitney J–57 consumes about 155 pounds per second of air which, at sea-level conditions, is about 1,600 cubic feet per second. The volume of air consumed per unit time by the engine is considerably less than the "boundary layer volume" as defined by Jones, which is the quantity of air displaced by the fuselage per unit time as it moves forward. Assuming a cruising speed of 400 miles per hour (about 588 feet per second), and assuming the F–100 fuselage is equal in volume to a cylinder 47 feet long and 6 feet in diameter (about 1,330 cubic feet), the volume of air displaced per second by the fuselage is about 16,600 cubic feet, which is more than 10 times what the engine consumes.

20. The primary purpose of the fuselage of the F–100 is to house personnel and equipment, including a jet engine, and to support the wings and tail structure. It is designed to provide minimum air resistance to the forward movement of the aircraft and to provide minimum interference with the lift of the wings.

The fuselage is not designed as a lift-producing element of the aircraft. However, at certain attitudes of flight, upward forces are created on the fuselage surface by airflow thereover, in accordance with the principles set out in findings 4–8. Such forces are minimal, and coexisting drag forces on the fuselage are 10 times or more greater than on a wing providing comparable lift. Therefore, the fuselage, unlike a wing or airfoil, is not efficient lifting body.

### Nacelle type aircraft

21. The A3D is representative of nacelle type aircraft involved in this suit. The other nacelle type aircraft, while different in most respects from the A3D, have substantially similar nacelle structures insofar as the infringement issue here is concerned. Therefore, the description of the A3D nacelle and its operating characteristics applies equally to the other nacelle type aircraft.

The nacelle or engine housing of the A3D is an elongated, streamlined, hollow, generally cylindrical-shaped body with open ends in which a jet engine is mounted with its axis parallel to the axis of the nacelle. The A3D has two nacelles, each housing one jet engine, one mounted to each wing by pylons which are narrow support struts streamlined for minimum resistance to airflow. The F–89 has two nacelles mounted one on either side of the fuselage near the lower middle.

The operation of the jet engines in the nacelles of the A3D and other nacelle type aircraft is in all material respects similar to the operation described in finding 19. Assuming the A3D nacelle is equal in volume to a cylinder 16.3 feet long and 4.2 feet in diameter (225 cubic feet), the volume of air displaced per second by the nacelle is about 8,100 cubic feet, more than 5 times what the engine consumes.

22. The nacelles of the nacelle type aircraft, like the fuselage of the open-fuselage type aircraft, are not designed as lift-producing elements of the aircraft. Rather, they are designed to support and

house jet engines. However, at certain attitudes of the flight, upward forces are created on the nacelle surface by airflow thereover, in accordance with the principles set out in findings 4–8. Such forces are minimal, and coexisting drag forces on the nacelle are many times greater than on a wing providing comparable lift. Therefore, a nacelle, like a fuselage, is not an efficient lifting body.

### THE PRIOR ACT

23. (a) Defendant introduced into evidence 41 prior art patents, 22 of which were cited by this court in *Jones I*. (Finding 26 in *Jones I*) The most pertinent prior art patents in this suit are listed below:

| Patentee and Country | Number | Date Issued | Considered in "Jones I" | Considered by Patent Office | Defendant's Exhibit No. |
|---|---|---|---|---|---|
| Betz et al. (Ger.) | 539,614 | 11/28/31 | Yes | No | 21–21a |
| Campini (G.B.) | 406,713 | 2/28/34 | Yes | No | 42 |
| Drexler (Ger.) | 359,421 | 9/21/22 | Yes | Yes | 30–30a |
| Dupré (Fr.) | 547,589 | 9/27/22 | Yes | No | 35–35a |
| Fono (Ger.) | 554,906 | 11/2/32 | No | No | 45r–45r1 |
| Hallowell (U.S.) | 1,725,914 | 8/27/29 | Yes | No | 29 |
| Lyons (U.S.) | 1,741,578 | 12/31/29 | Yes | No | 31 |
| Lysholm (U.S.) | 2,085,761 | 7/6/37 | No | No | 45g |
| MacCaskie (G.B.) | 377,237 | 7/22/32 | No | No | 45o |
| Martin (U.S.) | 1,847,093 | 3/1/32 | Yes | No | 38 |
| Oplatek (Ger.) | 589,059 | 10/31/35 | Yes | No | 25–25a |
| Stalker (U.S.) | 1,913,644 | 6/13/33 | Yes | No | 32 |
| Stout (U.S.) | 1,980,233 | 11/13/34 | Yes | No | 23 |
| Upson (U.S.) | 1,848,809 | 3/8/32 | Yes | Yes | 22 |

(b) Also in evidence as prior art is the following printed publication:

National Advisory Committee for Aeronautics Technical Memorandum No. 42, entitled "Motion of Fluids with Very Little Viscosity," by L. Prandtl, accession date in Library of Congress, March 3, 1928.

24. The Prandtl article, published in 1928, entitled "Motion of Fluids with Very Little Viscosity," describes experiments in which were studied flow characteristics of water over various shaped surfaces. The water contained small, light-reflecting particles so that photographs of flow patterns could be made.

Several photographs of fluid flow around a hollow cylinder show the turbulent boundary layer separating from the cylinder surface. Other photographs show a similar cylinder with a slot in its upper surface. A small tube, inserted in the cylinder interior, is used to withdraw fluid in the turbulent flow area from the exterior of the cylinder through the slot. The photographs therefore show, and are described in the text as showing, the withdrawal and elimination of turbulent boundary layer from a part of the top surface of the cylinder.

25. The patents to Betz et al., Upson, Stout, Oplatek, Stalker, Dupré, and Martin, noted in finding 23(a), are described in detail in *Jones I*. (Findings 28–34, respectively in *Jones I*.) They are pertinent here primarily to show the state of the art at the time Jones filed his patent application. For purposes of this suit, the patent teachings may be summarized as follows: Broadly, all the patents teach the idea of removing boundary layer air from one part of a wing or fuselage, compressing the air within the aircraft, and ejecting it out at another part of the wing or fuselage.

(a) Betz et al., entitled "Arrangement for Influencing the Boundary Layer of Bodies Exposed to a Flow," states that

it is old in the art to improve the flow conditions about a body "by suctioning off or removing the boundary layer of the medium moving along the body" and that "this removal of the boundary layer is used to increase the transverse thrust in the case of surfaces exposed to a flow such as airplane wings, propeller blades, and the like or for the purpose of diminishing the resistance in the case of such bodies or in vehicles." The drawing in Betz et al. shows an airplane wing having a leading edge, a trailing edge, and upper and lower cambered surfaces. The wing has one or more slots along its forward top surface through which boundary layer air is drawn off the upper wing surface into the wing interior by a compressor mounted inside the wing. The air thus drawn is compressed and ejected through one or more slots at the rear of the upper wing surface.

(b) Upson, in all material respects, is similar to Betz et al., except that Upson teaches a single slot in the forward top surface of the wing which extends the full span of the wing.

(c) Stout, in all material respects, is similar to Betz et al. and Upson except that the compressed air is ejected out the trailing edge of the wing rather than the rear upper surface of the wing.

(d) Oplatek, although not expressly referring to the concept of boundary layer air control, discloses a conventional propeller-driven airplane having a series of elongated openings in four rows extending over the entire span of each upper wing surface. The openings constitute, in effect, four spanwise slots in the surface. The lower surface of each wing is similarly provided with four rows of elongated slots. An airtight wall or partition extends horizontally fore and aft through each airfoil, separating the upper airfoil surface from the lower airfoil surface. Blowers mounted in the partition and driven by the aircraft engine draw air in from the upper slots and discharge it under pressure through the lower slots. The object of the construction disclosed is referred to as "means for producing buoyancy in airplanes by air conduction."

(e) Stalker, entitled "Means for Energizing the Boundary Layer on Aircraft Parts," teaches "provision of means for removing the boundary layer." Stalker's structure consists of an airplane wing having a plurality of slots along its upper cambered surface. By means of a blower and suitable partitions, air is sucked in from the rearward upper slots, compressed, and discharged out the forward upper slots.

(f) Dupré teaches a conventional propeller-driven airplane. The specification states as an object—

> * * * suctioning the streamlines on the external surface of the wing and on the periphery of the fuselage so as to diminish the effects of the friction and vortices * * * and convert them, as far as possible, into active reactions facilitating the propulsion of the apparatus.

The interior of the wing has a series of spaced air passages which extend fore and aft the wing from its leading edge to its trailing edge. Each air passage has an inlet opening in the leading edge of the wing and an outlet opening in the trailing edge of the wing. The inlet openings, as well as the outlet openings, adjoin each other so as to form in effect a continuous edge opening. Blowers mounted in the air passages compress the air entering the openings in the leading edge and discharge it under pressure through the openings in the trailing edge.

(g) Martin states that one of the objects of the invention "is to provide an alteration of pressure distribution in flight so that the airplane drag is lessened and so that the lift of the airplane is increased." The drawing illustrates a propeller-driven airplane with the wing attached to the upper surface of the fuselage. The forward end of the fuselage has a series of circular slots which receive air under impact pressure as the airplane moves forward. A blower in the fuselage compresses the air and discharges it through slots in the upper and

lower portions of the fuselage and, in addition, through two slots in the upper surface of the wing. In an alternative embodiment, the Martin patent teaches a wing having two spanwise slots, one just above and one just below the leading edge, a compressor inside the wing, and three spanwise slots on the upper surface of the wing. Valves are provided to permit the pilot to open and close all the wing slots at will.

26. The Drexler and Hallowell patents both teach the idea of mounting a power plant inside an airfoil or wing which is open at its leading and trailing edges. Neither patent is expressly directed to controlling boundary layer air.

(a) Drexler, entitled "Airplane with Hollow Wings, Fins and the Like for the Reception of Loads," teaches a propeller-driven airplane wherein both the propellers and engines are mounted inside the wings. The wings are open at both their leading and trialing edges so that air enters the wing at the leading edge, is acted upon by the propeller inside the wing, and is discharged out the trailing edge of the wing. The advantage of such construction, so the patent states, is that propeller accidents to personnel are avoided and airflow over the wing surfaces is not disrupted by propeller movement.

(b) Hallowell teaches a rudimentary jet propulsion device in which a combustion chamber for burning fuel with air is located inside an airfoil, open at its leading and trailing edges. Air which enters the leading edge is mixed and burned with the fuel and the resultant hot exhaust gases pass rearwardly out the trailing edge to produce thrust. The patent suggests use of a compressor "to further increase the pressure in the combustion chamber."

27. The Campini patent, cited and described in *Jones I*, is particularly pertinent to the issue of infringement by defendant's open-fuselage type aircraft. Campini discloses a jet-powered airplane comprising an elongated fuselage, wings, and a jet engine housed in the fuselage.

As shown in Fig. 7 of the patent, reproduced herein, the nose of the aircraft

CAMPINI          406,713

is open at orifice *1a*, which serves as the air inlet. Air entering the orifice flows through intake conduit *3* to compressors *4* which are staged to raise the pressure of the inlet air to a desired higher pressure. High pressure air leaving the compressors is then delivered to a combustion chamber *5* wherein the air is burned with fuel in burners *20*. Hot exhaust gases from the combustion chamber pass through exhaust cone *24* at the rear of the fuselage and issue therefrom in a jet blast which provides propulsive force for the airplane.

524

The Campini aircraft permits entry of air through the nose opening of the fuselage substantially over the entire span of the fuselage. The air is compressed in the jet engine, burned with fuel, and discharged at the rear of the fuselage. The structure and its method of operation are substantially the same as defendant's open-fuselage type air craft alleged to infringe.

Fig. 4 of Campini, reproduced in finding 36 in *Jones I*, shows another embodiment in which air is taken into the fuselage through scoops on either side of the fuselage, rather than through an open-nose fuselage. The specification states that the air "drawn in is the layer of air immediately adjacent said skin surface."

28. The Lysholm patent is particularly pertinent to the issue of infringement by defendant's nacelle type aircraft. Lysholm discloses an airplane powered by jet propulsion comprising an elongated fuselage, wings attached to the fuselage, and jet engines secured in housings, which, so the patent specification states, are "mounted on the wings in the usual manner." Although the engine housings are not described in detail in the specification, Fig. 2 of the patent shows that they are streamlined and, in general, have the appearance of the nacelles or pods of the nacelle type aircraft accused herein to infringe.

As shown in Fig. 1 of Lysholm, reproduced herein, jet propulsion units *24* and

LYSHOLM        2,085,761

*26* are mounted on the wings on either side of the fuselage. Referring to unit, *24,* it comprises a multistage compressor *A* and a gas turbine *B,* mounted on a common shaft *30.* The inlet end *32* of the compressor housing is open and permits unobstructed flow of air to the compressor as the plane moves forward. Compressed air is fed to combustion chamber *38,* where it is burned with fuel. Hot exhaust gases pass rearwardly through turbine *B* and outlet *52.*

The Lysholm engine housing structure permits entry of air through the forward housing opening substantially over the entire span of the housing. The air is compressed in the jet engine, burned with fuel, and discharged at the rear of the housing. This structure and its method of operation is similar to defendant's nacelle type aircraft alleged to infringe.

### VALIDITY AND INFRINGEMENT

29. Claim 7 was not claim originally filed with the patent application in the Patent Office. Rather it was added by amendment after the application had been twice acted upon by the patent examiner. The applicant represented to the Patent Office that claim 7, as well as claim 8 not here in issue, was added to "cover the complete steps concerning all possible sequences possessed by the invention." Claim 7 was allowed by the patent examiner without rejection.

30. Clause (a) of claim 7, as set forth in finding 15, states that the method defined by the claim is directed to an "aerodynamic section." Both the fuselage of defendant's open-fuselage type aircraft and the nacelle or pod of defendant's nacelle type aircraft are "aerodynamic sections." (Finding 16.)

31. Clause (f) of claim 7 recites as the first step of the method "removing the boundary layer volume of air substantially over the entire span of said [aerodynamic] section." The air which enters the front of the fuselage of defendant's open-fuselage type aircraft and the front of the nacelle in defendant's nacelle type aircraft, while the aircraft is flying at normal cruising flight conditions, is ram air and its volume bears no relationship to "boundary layer volume" of air defined by the patent as interpreted herein and in *Jones I.* The air which constitutes Jones' boundary layer volume is removed and taken into the aerodynamic section in his invention for the purpose of modifying the coefficients of lift and drag of such sections. The air taken into a fuselage or nacelle of defendant's accused aircraft is to supply the jet engines with oxygen for combustion. Any modification of lift and drag coefficients of the fuselage or nacelle which may occur by virtue of ram air entering the fuselage or nacelle is minimal and incidental.

32. Clause (g) of claim 7 recites as the second step of the method, "compressing said boundary layer volume of air." The air taken into the open fuselage and nacelles, respectively, of the accused aircraft to supply the jet engine is compressed before it enters the combustion chamber. However, such air is not "boundary layer volume" air and is not compressed as part of the stated purpose of the claim to "modify the coefficients of lift and drag of an aerodynamic section." Rather, the air is compressed prior to combustion to increase the efficiency and thrust of the jet engine.

33. Clause (h) of claim 7 recites as the third step of the method "discharging said [boundary layer] volume" at the "trailing edge of the said aerodynamical section." The volume of gases discharged by the jet engine in defendant's accused aircraft at the rear of the fuselage or nacelle is hot combustion exhaust products of jet fuel and air. It is discharged at the trailing edge of the fuselage or nacelle to produce thrust and not to modify the absolute coefficients of lift and drag of the fuselage or nacelle. Any such modification which might occur by the discharge of exhaust gases from the jet engine is minimal and incidental.

34. There is conflicting and unclear expert testimony whether the terms "span," "leading edge," "trailing edge," "normal atmospheric pressure zone," "resultant atmospheric pressure zone," "nor-

mal pressure zone," "subatmospheric pressure zone," and "super-atmospheric pressure zone," as used in claim 7 and as defined in the patent specification, find corresponding elements in defendant's accused method. It is unnecessary to resolve this conflict since, even assuming resolution most favorable to plaintiff, infringement still would not be made out in view of findings 31 to 33, above.

35. The Campini patent (finding 27) and the Lysholm patent (finding 28) teach jet aircraft whose operation is similar in all material respects to defendant's open-fuselage type aircraft and nacelle type aircraft, respectively. Claim 7, if construed to be infringed by the operation of defendant's aircraft, would be invalid in view of Campini and Lysholm.

36. Claim 7 is not infringed by the operation at normal cruising flight conditions of any of defendant's accused structures.

### CONCLUSION OF LAW

Upon the foregoing findings of fact which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover, and the petition is dismissed.